No. 79-04

IN THE SUPREME COURT OF THE STATE OF MONTANA

1980

---

STATE OF MONTANA,

Plaintiff and Respondent,

vs.

ARTHUR ELDON CAMPBELL,

Defendant and Appellant.

---

Appeal from:   District Court of the Twelfth Judicial District,
Honorable B. W. Thomas, Judge presiding.
In and for the County of Hill

Counsel of Record:

For Appellant:

Ralph T. Randono argued, Great Falls, Montana

For Respondent:

Hon. Mike Greely, Attorney General, Helena, Montana
Richard Larson argued, Assistant Attorney General,
Helena, Montana
Ronald Smith, County Attorney, Havre, Montana

---

Submitted:   April 14, 1980

Decided:   AUG 5 - 1980

Filed: AUG 5 - 1980

*Thomas J. Kearney*
Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

The State initiated this action by filing an information charging appellant Arthur Campbell with one count of driving under the influence of alcohol, sixth offense, and one count of operating a motor vehicle while adjudged an habitual offender. The information was filed in the Twelfth Judicial District Court, Hill County, the Honorable B. W. Thomas presiding. Approximately two months after the filing of the initial charges against Campbell, the District Court granted the State's motion to file an amended information adding a third count to the charges. The added count charged Campbell with negligent homicide.

Campbell entered pleas of not guilty to all three counts charged in the amended information. He also filed a motion to suppress testimony regarding certain identification testimony and the results of a blood test. Subsequent to a hearing on the motion to suppress, the trial court ruled that the identification evidence was admissible but that the blood test results should not be admitted. The State moved to reopen the suppression hearing for the presentation of further evidence. The District Court granted the motion and conducted another hearing into the matter of the admission of a blood test. After the hearing, the court entered a supplemental order denying Campbell's motion to suppress the blood test results.

Prior to trial on the charges, Campbell moved to sever Count II of the information relating to the habitual traffic offender charge. The District Court denied the motion.

Campbell came to trial on the charges in the amended information on May 14, 1979. The jury found him guilty of all charges. Campbell moved for a new trial or a judgment

notwithstanding the verdict. The motions were denied, and this appeal followed.

Appellant Campbell began the day of June 6, 1978, by drinking a beer. After drinking somewhere between ten and twelve beers, Campbell and his two companions, Vincent and Manuel Moreno, borrowed a Plymouth automobile to drive to Fresno Reservoir to go swimming.

Gus Keller observed the Plymouth heading west from Havre on Highway 2 toward Fresno. Keller was also headed west on Highway 2. The Plymouth passed his truck. Keller testified that the Plymouth "tapped" his truck twice as it passed. Keller also observed a highway patrol car approaching from the west with its lights flashing. Seconds later, Keller saw what appeared to be a puff of dust along the road ahead.

The highway patrol car Keller observed in the distance was being driven by Patrolman Gordon Hage. Patrolman Hage was proceeding east on Highway 2 to the scene of an accident. He was driving approximately 90 miles per hour with his lights flashing and siren on. The puff of dust Keller saw was caused by the collision of the Plymouth that Campbell was driving and Hage's patrol car. The collision occurred in the patrolman's lane near the edge of the highway. The Plymouth had turned across the highway in front of the oncoming patrol car. Patrolman Hage applied his brakes and veered to the right but was unable to avoid the collision. There was no indication that the driver of the Plymouth attempted to stop his vehicle before the collision.

There were no witnesses to the collision other than the occupants of the vehicles. None of them remember the collision itself. Witnesses who arrived on the scene shortly

after the collision found Officer Hage still inside his vehicle. They helped him from the car just as it burst into flames. Vincent and Manuel Moreno were discovered lying on the ground some distance from the Plymouth. Campbell was discovered in the front seat of the vehicle with his right foot wedged under the car's brake pedal and his body angled so that his head was resting on the seat near the passenger door.

All the parties involved in the accident were severely injured. They were taken immediately to the hospital in Havre and treated for injuries. An attempt was made to question Campbell while he was being treated. Patrolman Seyfert of the Highway Patrol attempted to talk with Campbell but was told by a nurse that it would be best if he did not do so. Patrolman Walston and Deputy Sheriff Glover did talk to Campbell. They were unable to get any coherent answers from him. Campbell did respond to some questions about the location of his pain and once spelled his name in the absence of the officers. Generally, however, Campbell showed confusion and incoherence.

After these attempts to question Campbell, Patrolman Seyfert requested that blood samples be taken from the occupants of the Plymouth. A blood sample was subsequently taken from Campbell. The District Court found that Campbell was not placed under arrest prior to the taking of the blood sample, that he was not advised of the purpose for the taking of the blood sample, and that he did not consent to the taking of the sample.

Campbell and Manuel Moreno ultimately recovered from their injuries. Patrolman Hage remains paralyzed as a result of injuries he suffered in the accident. Vincent

Moreno did not recover from the injuries he suffered. He died July 14, 1978.

At trial the State introduced the results of the blood alcohol test administered to Campbell shortly after the accident. The test showed Campbell's blood alcohol content was .20 percent. The State also introduced evidence tending to show Campbell was driving the Plymouth when the accident occurred. Patrolman Harold Wood was called as an expert witness. Patrolman Wood testified that his examination of the evidence at the accident scene led him to conclude that Campbell had been driving when the Plymouth collided with the patrol car. Sandy Bryant, a respiratory therapy technician who treated Campbell during his recovery from injuries suffered in the accident, testified about a conversation she overheard between Campbell and Manuel Moreno. Ms. Bryant stated Moreno asked Campbell, "Why did you do that?" to which Campbell replied, "You told me to see if I couldn't hit him." Ms. Bryant said the conversation took place about a week after the accident and that she thought the men were talking about the accident.

Campbell introduced evidence at trial indicating that he was not driving when the cars collided. Dr. Mark Jacobson, a physicist, testified that his analysis of the accident led him to believe the driver of the Plymouth would have been thrown from the car on impact. This testimony implied Campbell was not driving since he was not thrown from the car. Further, Manuel Moreno and Campbell both testified that Vincent Moreno was driving at the time of the accident. However, in a statement made shortly after the accident and before Vincent Moreno died, Manuel Moreno said Campbell had been driving when the accident occurred.

Campbell raises the following issues on appeal:

1. Did the District Court err in admitting the results of Campbell's blood test taken shortly after the accident into evidence?

2. Did the District Court have jurisdiction to hear the charge of driving while under the influence of alcohol?

3. Did the District Court err in refusing to sever Count II of the amended information from the other two counts?

4. Is the jury's verdict supported by sufficient evidence?

The first issue Campbell raises presents three questions for consideration. The first question presented is whether Campbell was unconscious or otherwise in a condition rendering him incapable of refusing to consent to the taking of the blood sample. This question arises because Campbell was not placed under arrest before the taking of the blood test. An arrest is a prerequisite to the taking of a blood sample if a defendant is conscious and capable of refusing to consent to the test. State v. Mangels (1975), 166 Mont. 190, 193, 531 P.2d 1313. Since Campbell was not arrested, the test results would be inadmissible here if Campbell was conscious and capable of refusing consent.

The State does not contend that Campbell was unconscious when the blood test was administered. The question, therefore, is whether Campbell was in a condition rendering him incapable of refusing to consent to the taking of the sample. The standard for determining whether a party is in a condition rendering the party incapable of refusing consent is set out in Mangels where we said, ". . . we only require that the incapacity be determined on the basis of the best

evidence which is reasonably available to the officer . . ."
166 Mont. at 194, 531 P.2d at 1315. Applying that standard
in Mangels, we found that a highway patrolman improperly
determined that Mangels was incapable of refusing consent to
the test where Mangels appeared confused, was suffering from
abrasions after an accident, and where the patrolman did not
talk to Mangels at any time before the taking of the blood
sample. 166 Mont. at 192, 194, 531 P.2d at 1313, 1314.

The District Court in this case applied the Mangels
test and determined that the best evidence reasonably avail-
able to the officers here indicated Campbell was in a condi-
tion rendering him incapable of refusing to consent to a
blood test. The following evidence was introduced at the
suppression hearing to support this determination by the
District Court. Patrolman Seyfert testified that when he
arrived on the accident scene he found Campbell lying on the
front seat of the Plymouth. Seyfert stated Campbell's face
was covered with blood and that Campbell was moaning and
groaning. Seyfert said Campbell did not respond to the
questions he asked him. Patrolman Seyfert further stated
that when he attempted to question Campbell at the hospital
a short time after the accident, a nurse told him that it
was best not to try to see Campbell.

Patrolman Walston stated that he attempted to question
Campbell outside the X-ray room at the hospital shortly
before the taking of the blood sample. Walston testified
that he asked Campbell his name and several other questions
but got no meaningful response. He said that at one point
Campbell did answer a question as to his name but gave
another name. Patrolman Walston said Campbell mainly swore
and asked for "Dot" during the time he attempted to ques-
tion him.

Deputy Sheriff Glover asked Campbell questions for about five minutes after Campbell had been taken to the hospital. Glover stated that he got only one coherent answer from Campbell during the questioning. Glover said Campbell gave him a name in response to a question about his name. However, the name Campbell gave was not his own.

This evidence indicates the District Court was correct in determining Campbell was incapable of refusing to consent to the blood test under the Mangels standard. In Mangels the officers only had evidence of confusion on the part of the defendant, minor injuries, and did not attempt to question the defendant. Here, the officers observed that Campbell was seriously injured and in great pain, were advised by a nurse that it would be better not to try to talk to him, and could not get him to respond coherently to questions when they did talk with him. Given this evidence available to the officers, it appears they properly determined that Campbell was in a condition rendering him incapable of refusing to consent to a blood test.

The second question presented by this issue is whether Montana's implied consent statute only allows the taking of a blood sample from an individual after a valid arrest even if the individual is unconscious or otherwise incapable of refusing to consent to the test. Mangels also spoke to this question. In interpreting the implied consent statute, we specifically held that an arrest was not a prerequisite to the taking of a sample if the party tested was unconscious or incapable of consenting to the test. 166 Mont. at 193, 531 P.2d at 1314. Thus, if Mangels is given effect here, the rule set out in that case disposes of this question.

Campbell argues that Mangels should be overruled insofar as it holds an arrest is not a prerequisite to administering a blood test when a party is unconscious or incapable of consenting to the test. Campbell contends this aspect of Mangels should be overturned because of the plain language of the implied consent statute and the intent of the legislature in enacting the statute as evidenced by the title of the original act. These are the same arguments originally made in Mangels. See 166 Mont. at 193, 531 P.2d at 1314. The arguments did not persuade us then and are no more persuasive now. It is apparent from a reading of the implied consent statute that an arrest is not a prerequisite to administering a blood alcohol test to a party who is unconscious or otherwise incapable of consenting to the test. We, therefore, reject Campbell's argument and affirm the decision made in Mangels.

The third question presented by this issue is whether the Fourth Amendment protection against unlawful searches prohibits the taking of a blood test from an unconscious or otherwise incapable person without an arrest.

We previously addressed this issue in State v. Deshner (1971), 158 Mont. 188, 489 P.2d 1290. In Deshner police had a blood sample taken from the defendant shortly after he was involved in an automobile accident. The defendant was unconscious when the sample was taken. The police did not arrest the defendant before requesting the blood sample. The defendant asserted the results of the blood test should not be admitted at his trial for manslaughter. He contended that taking the blood sample without placing him under arrest constituted an unconstitutional search. The Court found no merit in defendant's argument. 158 Mont. at 192,

489 P.2d at 1292. The Court stated the taking of the blood sample under these circumstances was constitutionally proper because the officer might reasonably have believed he was confronted with an emergency situation in which the evidence would be destroyed if time was taken to procure a warrant, and the procedures used in taking the blood were reasonable. 158 Mont. at 193, 489 P.2d at 1293.

Campbell attacks the holding in Deshner by inference. He does so by citing cases from other jurisdictions which reach a result contra to the holding in Deshner. There is a split of authority on the question of whether an arrest is required before a blood sample can be taken from an unconscious person. Annot., 72 A.L.R.3d 325, §4 (1976); 2 LaFave Search & Seizure §5.4(b) at 342-344. However, a United States Supreme Court case decided since Deshner and at least one commentator's analysis indicate we should reject Campbell's argument to adopt the line of cases contra to Deshner.

In Cupp v. Murphy (1973), 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900, a defendant voluntarily went to a police station to discuss the strangulation death of his estranged wife with the authorities. The police noticed a dark spot on the defendant's finger while questioning him. The police asked the defendant if they could take a sample of scrapings from his fingernails. The defendant refused to consent to the scraping. Without consent, a warrant or an arrest, the police took the fingernail scraping samples. The samples revealed incriminating evidence which was introduced at the defendant's homicide trial. The Court held the search did not violate the defendant's Fourth Amendment rights. A quote from Mr. Justice Blackmun's concurring opinion summarizes the holding of the Court:

"The Court today permits a search for evidence without an arrest but under circumstances where probable cause for an arrest existed, where the officers had reasonable cause to believe that the evidence was on the respondent's person, and where that evidence was highly destructible. . ." 412 U.S. at 300, 93 S.Ct. at 2006, 36 L.Ed.2d at 908.

In discussing Cupp and the split of authority on the issue of whether an arrest is an absolute prerequisite to the taking of a blood sample from an unconscious party in a drunk driving situation, LaFave, supra, states:

". . . Indeed, the case for permitting the taking of the blood sample upon probable cause that the defendant is intoxicated without first arresting him is, if anything, stronger than the case for the searches conducted in Cupp and Franklin. In the blood sample case, as opposed to those cases, there is no room whatsoever for the argument that the lack of a formal arrest may decrease somewhat the chances that the evidence will be destroyed, for the 'evanescent' character of the evidence is inherent in its nature and does not depend upon any motive of the defendant to destroy it. That is, the need for the blood sample arises out of the fact, as stated in Schmerber v. California, 'that the percentage of alcohol in the blood begins to diminish shortly after drinking stops,' an emergency which is in no way affected by whether or not the defendant has been formally arrested. It is the height of formalism, to say the least, to suggest that a warrantless search on probable cause in order to meet this emergency is reasonable only if the police first declare the hospitalized defendant under arrest. In particular, it 'would be ridiculous to require a police officer to perform some formal ritual of arrest over the unconscious body of a critically injured person who was a party to a fatal automobile accident.' The claim that the contrary position 'provides some measure of assurance that probable cause is based upon considerations independent of the blood-alcohol test results' is untenable, as the need for a court to determine that probable cause existed prior to the test is present under either rule." §5.4(b) at 343-344.

The above summary of Cupp and LaFave's comments on the question indicate there is no per se arrest requirement for a warrantless search. That analysis is consistent with Deshner and the line of authority from other jurisdictions

that hold an unconscious driver need not be arrested before a blood sample can be taken. Cupp and LaFave's comments thus provide a solid basis for continuing to adhere to the Deshner holding. We, therefore, reject Campbell's argument that the line of authority contra to Deshner should be adopted and reaffirm the Deshner decision.

Having analyzed the three separate questions Campbell raises under the first issue, it is now necessary to summarize the analysis to resolve the ultimate question of whether the District Court erred in admitting the results of the blood test into evidence. Initially, the evidence shows the District Court properly found that Campbell was in a condition that rendered him incapable of refusing to consent to the taking of the blood sample when the sample was taken. This means the absolute arrest requirement for conscious individuals who are capable of refusing consent established by statute and explained in Mangels does not come into play. Thus, the blood test results are not automatically inadmissible here because no arrest occurred.

Further, Campbell only repeats arguments we previously rejected in Mangels to support his contention that Montana's implied consent statute requires an arrest before a blood sample can be taken even if an individual is unconscious or otherwise in a condition rendering the party incapable of refusing to consent to the taking of the sample. The arguments were not persuasive when presented in Mangels and are no more so now. Therefore, we reaffirm our decision that Montana's implied consent statute does not contain an absolute arrest requirement before a blood sample can be taken from an unconscious or otherwise incapable person and hold the blood test results here are admissible under Montana's implied consent statute.

Finally, Campbell's Fourth Amendment claim lacks merit. We rejected Campbell's argument in Deshner. Cupp supports the decision. Thus, the blood test results are not inadmissible on the basis of Campbell's constitutional argument.

This summary shows none of the questions raised by Campbell constitute a basis for refusing to admit the results to the blood test. Therefore, the District Court did not err in admitting the results into evidence.

The second issue raised by Campbell involves the District Court's jurisdiction to hear the driving while intoxicated charges brought against him. Jurisdiction of the District Court over criminal matters depends on the maximum sentence that can be imposed for committing the crime. When the maximum sentence increases to give the District Court jurisdiction because of repeated offenses, proof of prior offenses does not become an element that must be proved at trial and can be proved at any time until sentencing. Therefore, failure to introduce evidence of prior convictions at trial does not deprive the District Court of jurisdiction. State v. Nelson (1978), ___ Mont. ___, 583 P.2d 435, 437-438, 35 St.Rep. 1337, 1339-1341.

Campbell contends here that the District Court did not have jurisdiction over the D.W.I. charge brought against him because the State introduced no evidence at trial proving prior D.W.I. convictions. This contention lacks merit under Nelson and does not constitute grounds to dismiss the D.W.I. charge filed against Campbell.

The third issue Campbell raises concerns the severance of Count II of the information filed against him from Counts I and III. Count II of the information charged Campbell with driving while adjudged an habitual traffic offender.

Count I of the information is the D.W.I. charge, and Count III is the negligent homicide charge.  Campbell contends Count II of the information should have been severed from the other counts based on section 46-11-404(4), MCA.  That section reads in pertinent part:

> "If it appears that a defendant or the state is prejudiced by a joinder of related prosecutions . . . the court may order separate trials . . . or provide any other relief as justice may require."

Campbell asserts that joining the habitual offender charge with the other two charges here prejudiced his case and that he should, therefore, have been granted severance under section 46-11-404(4), MCA.

We have set out three basic kinds of prejudice that may occur on the joinder of similar offenses.  State v. Osborn (1976), 170 Mont. 480, 489, 555 P.2d 509.  The first kind of prejudice results when the jury considers a person facing multiple charges to be a bad man and tends to accumulate evidence against him until it finds him guilty of something. The second type of prejudice manifests itself when proof of guilt on the first count in an information is used to convict the defendant of a second count even though the proof would be inadmissible at a separate trial on the second count.  The third kind of prejudice occurs when the defendant wishes to testify on his own behalf on one charge but not on another.  Osborn, 170 Mont. at 489, 555 P.2d at 515.

Determining whether there has been prejudicial joinder involves weighing the prejudice incurred by the defendant because of a joint trial against the judicial economy resulting from a joint trial.  This balancing process is left to the sound discretion of the trial judge.  Absent a showing of abuse of that discretion, an appellate court should

not substitute its judgment for that of the trial court. United States v. Cuesta (5th Cir. 1979), 597 F.2d 903, 919.

In striking the balance between prejudice to a defendant and judicial economy, considerations of judicial economy exert strong pressure in favor of joint trials. United States v. Dohm (5th Cir. 1979), 597 F.2d 535, 540. The factors that provide the basis for the predisposition for joint trials include expedition of the administration of justice, reduction in the congestion of trial dockets, conservation of judicial time, reduction of burden on citizens who serve on juries in terms of time and money sacrificed, and avoidance of the necessity of recalling witnesses who would otherwise have to testify only once. United States v. Brady (9th Cir. 1978), 579 F.2d 1121, 1128, cert. denied, 439 U.S. 1074, 99 S.Ct. 849, 59 L.Ed.2d 41.

Further, the burden of showing prejudice rests on the defendant. ~~Osborn~~ *Osborn*, 170 Mont. at 489, 555 P.2d at 515. In showing prejudice, it is not sufficient that the defendant prove some prejudice or that a better chance of acquittal exists if separate trials are held. Rather, the defendant must show the prejudice was so great as to prevent a fair trial. Dohm, 597 F.2d at 539; United States v. Martinez (1st Cir. 1973), 479 F.2d 824, 828. Given this high standard of proof and the deference afforded the discretion of the trial court's judgment on balancing prejudice against judicial economy, reversal of a decision not to sever criminal charges is seldom granted. Brady, 579 F.2d at 1127; United States v. Barrett (7th Cir. 1974), 505 F.2d 1091, 1106, cert. denied, 421 U.S. 964, 95 S.Ct. 1951, 44 L.Ed.2d 450.

Under this standard of review, we must now consider the different kinds of prejudice listed in ~~Osborn~~ *Osborn* to determine

-15-

the merits of Campbell's severance claim.  The first type of

prejudice--prejudice resulting from the jury believing the

defendant to be a bad man because of multiple charges--has

seldom been found sufficient to warrant severance.  ~~Osborn~~ *Osborn*,

170 Mont. at 489, 555 P.2d at 514-515.  In fact, it has been

specifically held that the prejudice incurred by a defendant

from being held out to the jury as an "habitual offender" is

not alone sufficient to entitle the defendant to separate

trials.  Pummill v. United States (8th Cir. 1961), 297 F.2d

34, 36; see also Wright, Federal Practice and Procedure §222

at 437.

We agree that the mere inclusion of an habitual offender

count in an information is insufficient to automatically

require severance of that charge from other charges.  It

would be contrary to the considerations of judicial economy

set out above to require separate trials whenever one count

of an information charges a party with being an habitual

offender.  That would be especially true in this case where

all the charges stemmed from the same incident and the main

fact in issue as to all the charges was whether or not

Campbell was driving.  To grant severance would require

essentially the same evidence about the same occurrence to

be introduced at two different trials.  We, therefore, do

not find the District Court abused its discretion in holding

Campbell's motion for severance should not have been granted

because the jury considered him a bad man.

The second kind of prejudice from joinder is present

when the jury uses proof of guilt on one count in an informa-

tion to convict a defendant on another count in the informa-

tion even though the proof would have been inadmissible at a

separate trial on the second count.  No prejudice of this

nature will be found when the evidence presented at a joint trial is simple and distinct. Commonwealth v. Peterson (1973), 453 Pa. 187, 307 A.2d 267, 271; Drew v. United States (D.C. Cir. 1964), 331 F.2d 85, 91. This rule is based on the rationale that when the charges are few and the evidence straightforward, there is no reason to assume the jury was confused and could not keep the relevant evidence separate. United States v. Jamar (4th Cir. 1977), 561 F.2d 1103, 1107-1108; Peterson, 307 A.2d at 271, citing United States v. Lotsch (2nd Cir. 1939), 102 F.2d 35, 36, cert. denied, 307 U.S. 622, 59 S.Ct. 793, 83 L.Ed. 1500. See also United States v. Luna (1st Cir. 1978), 585 F.2d 1, 5, cert. denied, 439 U.S. 852, 99 S.Ct. 160, 58 L.Ed.2d 157.

Here the charges are few and the evidence straightforward. Only three charges were brought against Campbell at the trial. The main fact in issue concerning all three was whether Campbell was driving at the time the accident occurred. Proof that Campbell was driving was an element of all the crimes charged by the information. Thus, evidence pertaining to that fact would have been admitted even if the trials on the different counts had been separated. The other evidence introduced at the trial, such as proof of Campbell's blood alcohol content and the fact that Campbell had been adjudged an habitual offender at the time the accident occurred, was neither voluminous nor complex. Under these facts, we cannot assume the jury was confused and did not consider only the relevant evidence in reaching a verdict on each count of the information. Therefore, we find any prejudice of this nature insufficient to hold the District Court abused its discretion in denying Campbell's motion for severance.

The third type of prejudice occurs when the defendant wants to testify on his own behalf on one charge but not on the others. Campbell stated in this case that he wanted to testify as to the D.W.I. and negligent homicide charges, but not the habitual offender charge.

As we pointed out in ~~Osborn~~ Osborn, the federal courts have only considered this type of prejudice where the alleged offenses were totally separate as to time, place and evidence. 170 Mont. at 489, 555 P.2d at 515. It has also been held that a defendant cannot claim this type of prejudice when the state does not exploit the fact that the defendant takes the stand by cross-examining the defendant as to the charge about which the defendant did not want to testify. Bradley v. United States (D.C. Cir. 1969), 433 F.2d 1113, 1123.

Here Campbell fails to demonstrate prejudice under either of these criteria. The charges all stemmed from one incident that occurred at the same time and place, and the evidence introduced to prove all the charges was similar. Further, Campbell did take the stand and testified that he was not driving the car when the accident occurred. The State on cross-examination limited its questions mainly to Campbell's activities on the day of the accident. The State did not question Campbell about his habitual offender status. Under these circumstances, we do not find the District Court abused its discretion in denying Campbell's motion for severance based on this type of prejudice.

Under the above analysis, Campbell did not demonstrate any of the kinds of prejudice necessary to require the District Court to order separate trials on the charges contained in the information. Therefore, the District Court did not err in failing to grant Campbell's motion to sever.

-18-

The final issue Campbell raises concerns the sufficiency of the evidence to support the jury's verdict. It is the duty of the jury to hear the evidence and to decide if the evidence presented is sufficient to support a conviction on the charges brought against a defendant. This Court will not disturb the decision of the jury as to the sufficiency of the evidence if the record contains substantial evidence to support the decision. Deshner, 158 Mont. at 191, 489 P.2d at 1290.

Here the main evidentiary question was whether Campbell was driving when the accident occurred. The evidence on this question introduced at trial was conflicting. Campbell introduced the following evidence to support his assertion that he was not driving when the accident occurred: (1) His testimony that he was not driving; (2) Manuel Moreno's testimony at trial that Vincent Moreno was driving when the accident occurred; (3) the expert testimony of physicist Dr. Mark Jacobson that the driver of the car would have been thrown from the car coupled with the evidence that Campbell remained in the car on impact; and (4) testimony to refute the theory advanced by Patrolman Wood tending to show Campbell was driving when the accident occurred.

The State presented the following evidence to the jury to show Campbell was driving when the accident happened: (1) A statement by Manuel Moreno after the accident but before Vincent Moreno died that Campbell was driving when the accident occurred; (2) the expert testimony of Highway Patrolman Harold Wood that the driver of the car would have remained in the car on impact, coupled with the testimony that Campbell was found in the car after the accident; (3) testimony to refute the theory advanced by Dr. Jacobson

tending to show Campbell was not driving when the accident occurred; (4) testimony by Sandra Bryant concerning the accident during which Moreno asked Campbell, "Why did you do that?" to which Campbell replied, "You told me to see if I couldn't hit him."

Presented with the conflicting evidence, the jury concluded Campbell was driving when the accident occurred. While evidence to prove the contrary conclusion is present in the record, the evidence introduced by the State is substantial and does support the conclusion that Campbell was driving when the accident occurred. Therefore, we will not disturb the jury's verdict.

Affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____
Justice

Mr. Justice John C. Sheehy, concurring specially:

I concur in the result foregoing.

I want to point out that any person who operates a motor vehicle upon the public highways of this state is deemed to have given consent to a chemical test of his blood if arrested by a peace officer for driving while under the influence of intoxicating liquor. Section 61-8-402(1), MCA. A person who is unconscious or who is otherwise in a condition rendering him incapable of refusal, is deemed not to have withdrawn his consent. Section 61-8-402(2), MCA. Campbell's implied consent to the blood test is not considered withdrawn here because Campbell fits within the narrow exceptions set forth in Mangels, supra, that an arrest is not necessary where a person qualifies as an unconscious or incapable person under section 61-8-402(2), MCA.

I want my position regarding the second issue, the District Court's jurisdiction of the offense of driving while under the influence of alcohol, to be clear.

In section 61-8-401, MCA, it is provided that driving under the influence is unlawful and punishable as provided in section 61-8-714(1), MCA.

Section 61-8-714(1), MCA provides that a first conviction of driving while intoxicated shall be punished by a fine of not less than $100 or more than $500. On a second conviction, the driver is punished by a fine of not less than $300 or more than $500 to which may be added in the discretion of the court imprisonment for 30 days. On a third or subsequent conviction, the driver is punished by imprisonment of not less than 30 days or more than 1 year, to which may be added in the court's discretion, a fine of not less than $500 or more than $1,000.

The difference in the penalties for the successive convictions becomes important when one considers whether the jurisdiction of the District Court or the justice court applies.

Under section 3-5-302(1), MCA, the District Court is given original jurisdiction in all felony criminal cases and "all cases of misdemeanor not otherwise provided for." The justice court, on the other hand, is given criminal jurisdiction of all misdemeanors punishable by a fine not exceeding $500 or imprisonment not exceeding 6 months or both. Section 3-10-303(1), MCA.

From the statutes, therefore, District Courts have no jurisdiction of a misdemeanor involving a first conviction or a second conviction of driving while intoxicated. On the other hand, the District Court would have exclusive criminal jurisdiction of driving while intoxicated charges involving 3 or more convictions. Since Campbell was charged with a sixth offense of driving while intoxicated, the District Court had exclusive jurisdiction of this count.

_____
                      Justice

Mr. Justice Daniel J. Shea dissents and will file a written dissent later.