No. 81-183

IN THE SUPREME COURT OF THE STATE OF MONTANA

1982

THE STATE OF MONTANA,

Plaintiff and Respondent,

vs.

KARL W. MORGAN,

Defendant and Appellant.

Appeal from: District Court of the Eighteenth Judicial District,
In and for the County of Gallatin
Honorable Joseph B. Gary, Judge presiding.

Counsel of Record:

For Appellant:

McKinley Anderson argued, Bozeman, Montana

For Respondent:

Hon. Mike Greely, Attorney General, Helena, Montana
Mike McGrath argued, Assistant Attorney General, Helena,
Montana
Anne Sheehy, Intern, argued, Office of Attorney General,
Helena, Montana
Donald E. White, County Attorney, Bozeman, Montana
Robert Throssel, Deputy County Attorney, argued, Bozeman,
Montana

Submitted: February 22, 1982

Decided: June 18, 1982

Filed: JUN 18 1982

Thomas J. Kearney
_____ Clerk

Mr. Justice Fred J. Weber delivered the Opinion of the Court.

Defendant Karl Morgan appeals from a conviction of negligent homicide following a trial before a jury in the Eighteenth Judicial District, Gallatin County. He presents the following issues for review:

(1) Whether the motion to suppress the evidence of the defendant's blood alcohol test should have been granted.

(2) Whether the County Attorney's statement to the jury regarding the legal rate of intoxication in Montana, which was not included in the instructions to the jury, was prejudicial to the defendant.

(3) Whether the court has the power to order the defendant to make restitution to the survivors of the accident.

We affirm in part, vacate and remand in part.

On August 12, 1980, Karl Morgan left work about 5:00 P.M. and went to the MSU gym where it was his custom to workout and take a sauna. Morgan left the gym between 6:00 and 6:30 P.M. and on his way home stopped at a Bozeman bar, the Cat's Paw. He testified that he drank four drinks of scotch and water. After 7:30 P.M. he left the bar and started for home, westbound on old Highway 10.

Between 7:00 and 8:00 P.M., Holly Clarkin, her mother and father, her niece, and her niece's friend left Belgrade, Montana, to go shopping in Bozeman. Dark clouds had massed in the summer sky and it looked like rain. The Subaru Holly Clarkin was driving approached Bozeman in the eastbound lane of old Highway 10.

Karl Morgan recalled turning on his headlights as he was about to enter a storm and then a yellow flash. The next thing he remembered was an ambulance attendant standing beside his car.

Highway Patrolman Robert Koch was called to the scene at 7:55 P.M. Officer Koch found Morgan seated behind the wheel of his Dodge with the windshield shattered and the door sprung open. In response to questions, Morgan gave only a blank stare. Officer Koch also found that Holly Clarkin's mother and father, Pauline and Edwin Clarkin, were dead and that the other occupants of the Clarkin vehicle had received serious injuries.

After finishing his investigation of the accident, Officer Koch went to Bozeman Deaconess Hospital to obtain blood from Morgan to determine the alcohol content thereof.

Morgan was taken first to the emergency room and then to the intensive care unit. Morgan's brother Jerry testified that he was with his brother in the intensive care unit between 9:00 and 9:30 P.M. and that he had about a five minute conversation with him. At around 9:30 P.M. Jerry Morgan was asked to leave to permit the medical staff to work on the patient.

It was during this period, at 9:55 P.M., that Officer Koch arrived. When Morgan was located, he was being treated in the intensive care unit where he lay with his eyes closed, I.V. tubes issuing from his body, and a nurse was in attendance. Observing the gravity of the situation, Officer Koch sought the doctor in charge, Dr. Newsome, to inquire about Morgan's condition, to ask if he could speak to Morgan, and to determine if the doctor would authorize drawing a blood sample.

According to Officer Koch's testimony he asked the doctor "if Mr. Morgan was conscious, if he was able to understand if I would place him under arrest and advise him of the implied consent law of the State of Montana; and at that time the doctor said 'he would not be able to understand.

He is unconscious.'" The doctor authorized a nurse to draw blood, which she did and gave to Officer Koch. Koch made no attempt to talk to Morgan.

Dr. Newsome testified that Morgan was coherent and conscious and that he did not appear to be intoxicated. Dr. Newsome further testified that he talked to the officers, and authorized the drawing of a blood sample, but "wouldn't allow them (officers) to speak with him (Morgan) just at that time."

The blood sample was sent to the State Investigation Laboratory for analysis. The results showed a blood alcohol content of 0.17%.

I.

Whether the motion to suppress the evidence of the defendant's blood alcohol test should have been granted.

Section 61-8-402, MCA, provides:

> "(1)   Any person who operates a motor vehicle upon the public highways of this state shall be deemed to have given consent, subject to the provisions of 61-8-401, to a chemical test of his blood, breath, or urine for the purpose of determining the alcoholic content of his blood if arrested by a peace officer for driving or in actual physical control of a motor vehicle while under the influence of alcohol. The test shall be administered at the direction of a peace officer having reasonable grounds to believe the person to have been driving or in actual physical control of a motor vehicle upon the public highways of this state while under the influence of alcohol. The arresting officer may designate which one of the aforesaid tests shall be administered.
>
> "(2)   Any person who is unconscious or who is otherwise in a condition rendering him incapable of refusal shall be deemed not to have withdrawn the consent provided by subsection (1) of this section.
>
> "(3)   If a person under arrest refuses upon the request of a peace officer to submit to a chemical test designated by the arresting officer as provided in subsection (1) of this section, none shall be given. . ."

When Morgan's blood was taken, he was neither under arrest nor had he been given an opportunity to withdraw his consent. The taking of the blood could still have been proper, however, if either of the situations in 61-8-402(2) occurred. The testimony of Morgan, his brother, and the attending physician indicate that Morgan was conscious, so for the taking of the blood sample to have been proper, Morgan must have been "in a condition rendering him incapable of refusal."

That provision in 61-8-402(2) has previously been addressed by this Court. In State v. Mangels (1975), 166 Mont. 190, 531 P.2d 1313, the defendant was convicted of driving under the influence of alcohol. While at the hospital, Mangels appeared confused and was suffering from abrasions and contusions. At the request of a highway patrolman, a nurse took a blood sample. Mangels was not informed of the reason for the blood test or placed under arrest. The highway patrolman did not attempt to talk to Mangels. This Court did not allow the evidence of the blood test because the agreed facts did not indicate that the defendant's physical condition was so unstable that questions by the patrolman would have been injurious. This Court established a standard to determine if an officer has abused his discretion in determining if the person was incapable of refusing the test. "Here, we only require that the capacity be determined on the basis of the best evidence which is reasonably available to the officer." Mangels, 166 Mont. at 194, 531 P.2d at 1315. The highway patrolman in Mangels did not meet the standards set forth by this Court.

This Court in State v. Campbell (1980), _____ Mont. _____, 615 P.2d 190, 37 St.Rep. 1337, applied the standard in

Mangels to a defendant who was conscious but was unable to respond coherently. Campbell was charged with negligent homicide. In allowing admission of the blood test, this Court stated:

> "In Mangels the officers only had evidence of confusion on the part of the defendant, minor injuries, and did not attempt to question the defendant. Here, the officers observed that Campbell was seriously injured and in great pain, were advised by a nurse that it would be better not to try to talk to him, and could not get him to respond coherently to questions when they did talk with him. Given this evidence available to the officers, it appears they properly determined that Campbell was in a condition rendering him incapable of refusing to consent to a blood test." Campbell, 615 P.2d at 195, 37 St.Rep. at 1341.

In the present case, there was no evidence that Morgan was confused or incoherent at the hospital. The testimony of Morgan, his brother, and attending physician indicate that he was conscious, coherent, and able to answer questions. Defendant argues that, if asked, Morgan could have understood a request for a blood sample.

The highway patrolman saw Morgan at the scene of the collision. He tried to question Morgan but received only a blank stare. The highway patrolman knew, two hours later at the hospital, that Morgan's condition required intensive care. He could see from a distance that Morgan was lying on a bed with his eyes closed, that I.V.'s were being administered, and that a nurse was attending him. When he asked the doctor if he could talk to Morgan, the doctor wouldn't allow him to speak with Morgan at that time.

From the information available to the highway patrol officer, he determined that Morgan was "in a condition rendering him incapable of refusal" and asked that a blood sample be taken. It would not have been reasonable for the officer to have obtained further information concerning

-6-

Morgan's condition. The doctor thought that Morgan was in a serious enough condition that he would not allow the officer to talk with him. Even though Morgan was conscious and apparently coherent, his physical condition was serious enough as determined by his doctor to render him incapable of refusing to consent to a blood test.

## II.

Whether the County Attorney's statement to the jury regarding the legal rate of intoxication in Montana, which was not included in the instructions given to the jury, was prejudicial to the defendant.

On January 6, 1981, a hearing was held on a motion to suppress the evidence of the blood test. The District Court judge ruled that the results of the blood test would be admissible but because the trial was for negligent homicide and not for driving under the influence of alcohol, an instruction regarding the statutory presumption of intoxication would not be given to the jury. Section 61-8-401, MCA, provides:

> "(1)  It is unlawful and punishable as provided in 61-8-714(1) for any person who is under the influence of:
>
> "(a)  alcohol to drive or be in actual physical control of a motor vehicle upon the highways of this state;
>
> ". . .
>
> "(3)  In any criminal prosecution for a violation of subsection (1) of this section relating to driving a vehicle while under the influence of alcohol, the amount of alcohol in the defendant's blood at the time alleged, as shown by chemical analysis of the defendant's blood, urine, breath, or other bodily substance, shall give rise to the following presumptions:
>
> ". . .
>
> "(c)  If there was at that time 0.10% or more by weight of alcohol in the defendant's blood, it shall be presumed that the defendant was under the influence of alcohol."

-7-

Although the District Judge ruled that the results of the blood test would be admitted into evidence, he specifically ruled that:

> "The court will not instruct the jury on the effect of there being a percentage of blood alcohol in excess of .10 (ten percent (10%) or more by weight of alcohol) as being a presumption that the defendant was under the influence of alcohol as provided for in Section 61-8-401(3)(c)."

During the State's case in chief, Ken Anderson, a forensic scientist at the State Investigation Laboratory, testified that the blood taken from Morgan contained .17 grams percent alcohol. He went on to testify that at .17, a person's driving ability would be obviously impaired, that such a level would affect speech, hearing, balance, judgment, reaction time, as well as other motor skills. After taking into consideration the weight of the defendant, Anderson estimated that it would take eight and one-half twelve ounce cans of beer or the same number of one ounce drinks of 80 proof alcohol to reach a .17 result.

After the result of the blood test was admitted and after the explanation by Ken Anderson as to what the result meant, the Gallatin County Attorney chose to get before the jury that Montana has a presumed "legal rate of intoxication," even though the District Court had previously ruled that it would not give such an instruction to the jury. The "legal rate of intoxication" first entered the trial during the cross-examination of Dr. Newsome, the emergency room physician, by the County Attorney.

> "Q. You are familiar with blood alcohols, are you not?
>
> "A. Yes.
>
> "Q. And .17, is that considered a very high blood alcohol?

"A.  Moderately high, yes.

"Q.  Are you familiar with the fact that .10
is the legal rate in Montana of intoxication?

"A.  Yes."

The County Attorney again referred to the "legal rate
of intoxication" during his closing argument, which in part
provided:

> "There's no question but that according to
> his testimony that blood alcohol was going
> down, and it was down.  This is two hours
> later.  It was down to point one seven which
> is almost twice the legal rate of intoxica-
> tion in the State of Montana which he tells
> us is point one zero.  His own doctor knows
> that that's almost twice the legal rate of
> intoxication in the State of Montana under
> our laws.  When we are presented with a case
> such as this what we attempt to do is --"

(objection)

The only times that the "legal rate of intoxication"
presumption was brought before the jury, it was done by the
County Attorney.  Twice he disregarded the judicial holding
of the court that the jury would not be instructed as to a
presumed level of intoxication.  This sort of tactic by any
prosecutor in Montana is unacceptable.

Although the conduct by the County Attorney was improper,
it did not prejudice the defendant as to affect his having a
fair trial.  There was already sufficient evidence in the
testimony of Mr. Anderson as to what .17% alcohol meant.  If
we found that the County Attorney's statements could have
reasonably affected the verdict, we would have reversed
without hesitation.  Although the County Attorney's statements
were improper, the evidence already admitted was so extensive
that the defendant was not prejudiced.

### III.

Whether the court has the power to order the defendant
to make restitution to the survivors of the accident.

-9-

Sentencing of Morgan was deferred for three years with certain conditions including that he serve 60 days in jail on a work release program and make payments to the accident survivors. The District Court in paragraph 5 of its judgment dated January 19, 1981, ordered in part:

> "That the defendant is to make restitution upon his release from the county jail to the Clerk of the District Court for the Eighteenth Judicial District in the amount of $75.00 per month. The first payment shall be April 5, 1981 and on the 5th of each month thereafter for a period of three (3) years from the date of this sentence. Said restitution is to be distributed among Mary Janelle Saltz, Holly Clarkin and Rhonda VanDiest."

Section 46-18-201, MCA, provides the type of sentences that a District Court can impose. Section 46-18-201(1)(a) provides for deferment of sentencing with conditions such as the one received by Morgan.

> "(1) Whenever a person has been found guilty of an offense upon a verdict or a plea of guilty, the court may:
>
> "(a) defer imposition of sentence. . . The sentencing judge may impose upon the defendant any reasonable restrictions or conditions during the period of the deferred imposition. Such reasonable restrictions or conditions may include:
>
> ". . .
>
> "(iv) restitution."

In providing for the use of restitution where a court defers imposition of sentence, the State of Montana is following the trend of criminal sanctions in the United States. As stated in the American Bar Association Standards for Criminal Justice (2d ed. 1980) at 18.112-113:

> "The sanction of restitution is currently receiving unprecedented legislative and scholarly attention, as the focus of criminal justice reform has begun to shift to the victim of the crime. A 1978 survey found that some sixteen states had either enacted restitution legislation during 1976-

1977 alone or had pending in their legislatures bills that would establish some mechanism by which offenders would make good the losses caused their victims. More than fifty localities have undertaken experimental programs involving restitution, and a new form of penal institution has come into use -- the restitution shelter at which the offender resides while 'working off' the offense."

We agree with the conclusion set forth in the ABA Standards at 18.114-115 regarding the class of persons covered and the limitation to actual damages:

"Basically, case law has established that to be eligible to receive restitution, a claimant must be within the class of persons injured by the crime. . . A second well recognized limitation is that restitution must not exceed the actual damages or loss caused by the offender."

The defendant argues that the three girls injured in the collision do not fall within the class of persons injured by the crime. He bases his argument on State v. Stalheim (1976), 275 Ore. 683, 552 P.2d 829. In Stalheim the wife and daughter of the plaintiff were killed in an accident. The plaintiff was not personally involved in the accident, but sought damages for the loss of both his wife and daughter. The Oregon statute provided that a defendant shall make "restitution to the aggrieved party." The Oregon court did not allow restitution and construed "aggrieved party" to refer to the direct victim of the crime, and not to other persons who suffer loss because of the victim's death or injury. The ABA Standards at 18.114-115 provide with regard to the claimants as follows:

"As to the breadth of this class, courts have disagreed, although both sides of the debate recognize that a remoteness standard should be employed to disqualify some claimants whose injuries can be said to have resulted from the defendant's conduct under a purely 'but for' test. . . Traditionally, the claimant had to

be named in the indictment [Karrell v. U. S., 181 F.2d 981 (9th Cir. 1950)], and restitution could only be awarded with respect to those counts in a multicount indictment that resulted in conviction [U. S. v. Follette, 32 F.Supp. 953 (E.D. Pa. 1940); People v. Funk, 193 N.Y.S. 302 (1921)]. More recently, courts have split on whether restitution might be ordered with respect to counts that did not result in conviction but were dropped as a result of plea bargaining [U. S. v. Buechler, 557 F.2d 1002 (3rd Cir. 1977); U. S. v. Landay, 513 F.2d 306 (5th Cir. 1975)]. It is not the function of these standards to resolve these questions, but their existence shows the need for special legislative attention to the topic of restitution. . ."

While the Montana statute providing for restitution does not specifically address this problem, "The Crime Victim's Compensation Act of Montana" adopted in 1977 does give helpful guidance. That Act defines "victim" as follows:

"(6) 'Victim' means a person who suffers bodily injury or death as a result of:

"(a)   criminally injurious conduct;

"(b)   his good faith effort to prevent criminally injurious conduct; or

"(c)   his good faith effort to apprehend a person reasonably suspected of engaging in criminally injurious conduct." Section 53-9-103(6), MCA.

Under that Act a person who has suffered as a result of criminally injurious conduct is classed as a victim, without a relationship to a crime for which a conviction was obtained. That is a persuasive approach. We hold that the three girls in the vehicle fall within "the class of persons injured by the crime," making restitution proper.

As above-mentioned, the second limitation is that restitution must not exceed the actual damages. The record here does not show the actual damages caused to each of the three girls, and we are not able to determine if the restitution could exceed the actual damages.

Unfortunately, our statutes do not give significant guidance to the District Court as to the manner in which restitution is to be applied and as to the limitations which are applicable. The Uniform Law Commissioners Model Sentencing and Corrections Act (1979), U. S. Department of Justice, does set forth in considerable detail various of these factors to be applied in the application of the restitution theory. We now conclude that restitution may be allowed by payment of the money equivalent of loss resulting from property taken, destroyed, broken, or otherwise harmed, and also out-of-pocket losses such as medical expenses. (See section 3-601 of the Model Sentencing and Corrections Act.) In this case, the District Court may provide for payments to those suffering out-of-pocket losses for medical expenses, but not in excess of the actual money equivalent.

The District Court did not indicate the out-of-pocket expenses or losses for which restitution was being made, nor did it determine the amount of the losses as to each of the three recipients. It is not possible for this Court to determine if the order of restitution was proper.

We vacate that part of the sentence which requires payment of money and remand to the District Court for re-sentencing on that point. The District Court should hold such additional hearing as may be necessary, and set forth in written findings its basis for the restitution order. Unfortunately, the statutes do not set out standards to be applied on restitution awards similar to those on costs which are set out in section 46-18-232, MCA, as follows:

> "(2) The court may not sentence a defendant to pay costs unless the defendant is or will be able to pay them. In determining the amount and method of payment of costs, the court shall take into account the financial resources of the defendant and the nature of the burden that payment of costs will impose.

"(3) A defendant who has been sentenced to pay costs and who is not in default in the payment thereof may at any time petition the court that sentenced him for remission of the payment of costs or of any unpaid portion thereof. If it appears to the satisfaction of the court that payment of the amount due will impose manifest hardship on the defendant or his immediate family, the court may remit all or part of the amount due in costs or modify the method of payment."

We find the foregoing standards are reasonable standards for application to restitution payments. The District Court should apply the foregoing provisions to the present fact situation. In its findings the District Court should include sufficient facts to show compliance with the foregoing paragraphs.

Restitution is a theory being applied throughout the District Courts of Montana. Therefore, we suggest that it would be appropriate for the Montana Legislature to consider the various materials on restitution which are available, including the Model Sentencing and Corrections Act as well as the American Bar Association Standards for Criminal Justice, in order to determine if additional restitution provisions should be added to our statutes.

The judgment is affirmed with the exception of the vacation of that portion of the sentence requiring the defendant to begin making restitution upon his release from the county jail, in order that the District Court may take such additional steps as are necessary to comply with this opinion.

_____
Justice

-14-

We Concur:

_____
Chief Justice

_____

_____
Justices

_____
Hon. Gordon Bennett,
District Judge, sitting
for Mr. Justice John C.
Sheehy

-15-

Mr. Chief Justice Haswell, concurring in part and dissenting in part:

I concur with the majority that evidence of defendant's blood alcohol test is admissible and that the county attorney's statements were harmless error.

I dissent from the majority holding vacating the District Court's judgment and sentence requiring restitution. In my view the majority have written conditions and limitations on restitution on the basis of the Uniform Law Commissioners Model Sentencing and Corrections Act which has never been enacted in Montana. Additionally, the majority opinion denies the District Court judgment the presumption of regularity to which it is entitled by statute. Section 26-1-602(15) and (17), MCA.

The District Court is empowered to defer imposition of sentence on condition of restitution. No restrictions have been imposed on restitution although several legislative sessions have passed since 1973 where it was first statutorily authorized. See Chap. 513, Sec. 31, 1973 Session Laws; section 46-18-201(1)(a)(iv), MCA. On the other hand, the Uniform Law Commissioners Model Sentencing and Corrections Act imposes a variety of limitations on the sentencing court's authority to require restitution: a presentence report documenting the victim's pecuniary loss, limitations on what kind of losses are subject to restitution, the financial resources of the offender, etc. As I see it, this Court should be slow in limiting restitution by judicial decisions based upon Model Acts that have no counterparts in Montana.

I also object to vacating a judgment and sentence valid on its face because there is no underlying record which has been certified to us affirmatively showing the dollar amount of out of pocket expenses, the dollar amount of loss of each

victim and related matters. This puts the shoe on the wrong
foot. The burden is properly in the defendant to show error
in the restitution order. Here the defendant has made no
showing. Until he does, the District Court judgment and
sentence should be upheld.

Frank I. Haswell
Chief Justice

Mr. Justice Daniel J. Shea, concurring and dissenting:

Although I agree with the majority's decision on the restitution issue, I would order a new trial because the prosecutor not only violated the trial court's order, but in doing so, he twice misstated the law to the jury. In addition, I feel that the Chief Justice, in his dissent to the restitution holding, has overlooked some basic reasons why a restitution order, to be acceptable, should be supported by the evidence.

In holding the prosecutor's violation of the trial court's order to be harmless error, the majority has simply issued a bland warning not to do it again. I feel that the only proper remedy in light of this flagrant violation of the court's order is to order a new trial. This is the only way in which the prosecutors will know that they cannot violate a trial court's order and the defendant's rights with impunity. The prosecutor's actions were designed to bring the information to the jury's attention which the court held could not be done.

Further, the information brought before the jury was incorrect. The prosecutor supplied the doctor and the jury with the forbidden information by asking the doctor if he was "familiar with the fact that .10 is the legal rate in Montana of intoxication." This information, couched in the form of a question, not only violated the court's order, but it was also incorrect. A .10 percent blood alcohol level is not the legal rate of intoxication in Montana; rather, it gives rise to a presumption that the defendant was under the influence of alcohol. (Section 61-8-401(3)(c), MCA.) The jury could well have believed, because of this misinformation that a .10 percent blood alcohol level means that a person, under Montana law, is intoxicated. And the prosecutor's final

-18-

argument to the jury again pounded this point home by arguing that a .10 percent blood alcohol level was the "legal rate of intoxication in Montana" and that the defendant's blood alcohol count of .17 percent "is almost twice the legal rate of intoxication in the State of Montana under our laws."

It is insufficient for the majority to pass off these flagrant violations and misstatements of the law by a statement that ". . . there was already sufficient evidence in the testimony of Mr. Anderson as to what .17% alcohol meant.. . ." The undeniable fact is that the prosecutor not only twice violated the court's order but in doing so also misstated the effect in Montana of a .10 percent blood alcohol level. Because the prosecutor twice stated that a .10 percent blood alcohol level is the "legal rate of intoxication" in this state, the jury was left with the impression that as a matter of law, defendant was intoxicated. We have then two violations of a court order coupled with two misstatements of the law on which the prosecutor clearly intended the jury to rely. I cannot state, beyond a reasonable doubt, that these misstatements of the law did not contribute to the defendant's conviction. See Chapman v. California (1967), 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705. Therefore, I would vacate the judgment and order a new trial.

I feel some comment on the restitution issue is necessary because the dissent of Chief Justice Haswell seems to indicate that in imposing guidelines for restitution, this Court has arrogated to itself a power which belongs only to the legislature.

In permitting a district court to impose restitution as a condition of a deferred sentence (section 46-18-201(1)

-19-

(a)(iv), MCA, the legislature has utterly failed to give any guidelines about when restitution is to be considered an option. The dissent suggests that only the legislature can provide guidelines for restitution, and that any district court judgment imposing restitution is protected by the disputable presumptions contained in section 26-1-602, MCA. Subsection 15 of this statute provides a disputable presumption "that official duty has been regularly performed." And subsection (17) provides a disputable presumption "that a judicial record, when not conclusive, does still correctly determine or set forth the rights of the parties." I have no quarrel with these presumptions but they do not address the problems involved here. Translated, these presumptions mean only that the party taking the appeal must convince at least a majority of this Court that the trial court was wrong. Or put another way, it means that the party defending the appeal does not have the burden of going forward to establish that the judgment is correct.

I do not think the legislature intended that district courts order restitution in any amount they desire; I do think that the legislature would consider it a laudable goal to have an evidentiary record in support of any restitution ordered by the district court. Otherwise, an order would be nothing less than a fiat, based only on the personal predilections of the sentencing court. And certainly this Court, in the exercise of its appellate jurisdiction, has the right to determine whether an order of the sentencing court is supported by the evidence.

Restitution can be likened to a civil judgment for damages. Each element of damages must be supported by the evidentiary record. And so must each factor on which

restitution is based. In permitting a trial court to order restitution, it can hardly be said that the legislature intended that the district court have plenary power to decide the issue without benefit of appellate review.

By analogy, the legislature has created a cause of action for wrongful death (section 27-1-513, MCA), but the elements of recoverable damages are not listed in this statute or in any other statute. Instead, this Court, by its decisions, has given meaning to the cause of action by setting forth in various decisions the items of damages that are recoverable. I see our function as being no different here, where we are simply setting forth the guidelines for district courts to follow when restitution is considered as a sentencing option. This Court has followed a clear, if unsteady, policy of requiring the sentencing courts to set forth their reasons for their sentences. Our failure to require sentencing courts to justify their sentences would eventually result in these courts never giving reasons for their decisions. These courts would simply fall back on the so-called presumptions of regularity contained in sections 26-1-602(15) and (17), MCA, as their justification for not explaining their decisions.

This Court was faced with the situation of determining not whether restitution was proper as a principle, but whether the amount of restitution was proper under the facts. As the majority opinion states: "The record here does not show the actual damages caused to each of the three girls, and we are not able to determine if the restitution could exceed the actual damages." Clearly, then, it is proper for this Court to remand for resentencing, and in doing so, to set forth guidelines for the district courts to use when ordering restitution. These guidelines will help

-21-

the district courts, the public will have confidence that the function of restitution is not being abused, and these guidelines will certainly aid this Court in performing its function of appellate review.

Daniel J. Shea
Justice