# STATE OF MONTANA,
## Plaintiff/Respondent,
### v.
# JASON HARDAWAY,
## Defendant/Appellant.

No. 99-626.
Heard April 30, 2001.
Submitted May 17, 2001.
Decided December 10, 2001.
2001 MT 252.
307 Mont. 139.
36 P.3d 900.

140

For Appellant: **Jack E. Sands**, Billings (argued).

For Respondent: **Hon. Joseph P. Mazurek**, Montana Attorney General, **John Paulson**, Assistant Montana Attorney General (argued), Helena; **Dennis Paxinos**, Yellowstone County Attorney, **Ira Eakin** and **Beverly Tronrud**, Deputy Yellowstone County Attorneys, Billings.

JUSTICE COTTER delivered the Opinion of the Court.

¶1 On June 8, 1999, a jury in the Thirteenth Judicial District Court, Yellowstone County, found Jason Hardaway (Hardaway) guilty of burglary. Hardaway appeals from this verdict. We reverse.

¶2 Hardaway raises three issues on appeal:

1. Did the District Court properly deny Hardaway's motion to suppress blood evidence swabbed from his hands without a warrant following his arrest?

2. Did the District Court err in denying Hardaway's motion to dismiss the amended information, and in allowing the jury to convict under an alternative instruction?

3. Did the District Court abuse its discretion by denying Hardaway's motion for a mistrial?

## FACTUAL BACKGROUND

¶3 On January 22, 1999, Chris Dobitz (Dobitz) was awakened around 4:30 a.m. by the squeaking of her screen door and noises emanating from her attached garage. She got up from her bed and went to investigate these sounds. She found a man standing about two feet inside her kitchen doorway leading from the attached garage. She asked the man what he was doing, and he replied, "Sorry, wrong house." She took a step back and turned on the kitchen light. The man turned and ran back through the garage and out the garage door. Dobitz chased the intruder and saw items falling from his jacket. She stopped her pursuit to pick up the fallen items, which turned out to be pornographic magazines. Dobitz returned home and called the police.

¶4 Billings police officers immediately responded to her call. Officer Helderop began a search of the surrounding area, while Officer Philippi remained with Dobitz and investigated the scene. Officer Philippi observed that the screens to the basement windows had been

removed, a window on the detached garage had been broken, and the door to the attached garage had been forced open with a knife and a steel rod. He also found blood on doorknobs, light switches, broken glass, and on other items in the garage, as well as on the screen door handle and front doorknob of the house.

¶5 While patrolling the area surrounding Dobitz's house, Officer Helderop spotted Hardaway walking quickly across a street. Hardaway fit the description given by Dobitz of the intruder. Officer Helderop stopped Hardaway and conducted a pat-down search for weapons. Hardaway was carrying a bottle of Yohimbe Erection Lotion in his waistband. Officer Philippi had advised Officer Helderop by radio that the intruder may have cut his hand breaking a garage window, so Officer Helderop had Hardaway remove his gloves. He found what appeared to be fresh blood and cuts on Hardaway's hands. Officer Helderop placed Hardaway under arrest.

¶6 During post-arrest processing at the Yellowstone County Detention Facility, Hardaway's hands were photographed and the blood on his hands was swabbed. The blood evidence was sent to the Montana State Crime Lab, where forensic scientists were able to match the blood swabbed from Hardaway's hands with the blood found at the scene. Hardaway was charged by information on January 27 with burglary.

¶7 On May 18, 1999, Hardaway filed a motion to suppress the blood evidence swabbed from his hands at the jail shortly after his arrest without a warrant or his permission. The District Court denied Hardaway's motion. It reasoned that under State v. Holzapfel (1988), 230 Mont. 105, 748 P.2d 953 (viewing defendant's hands under an ultraviolet light was not a search), the swabbing of Hardaway's hands was not a search. It further reasoned, in the alternative, that under State v. Ulrich (1980), 187 Mont. 347, 609 P.2d 1218 (swabbing defendant's hands to conduct a neutron activation test to detect gunpowder residue was a lawful search incident to arrest), the law enforcement officers were justified in swabbing Hardaway's hands without a warrant as a search incident to arrest.

¶8 On May 26, 1999, the State moved to amend the information against Hardaway, alleging that he committed burglary by entering Dobitz's home with the intent to commit "either a theft or a sexual crime." Hardaway filed a motion to dismiss this amended information, alleging that the term "sexual crime" was insufficient to apprise him of the charge against him. The District Court denied his motion to dismiss, finding that the amended information's "sexual crime" description sufficiently put Hardaway on notice regarding the charge

against him.

¶9 A jury trial was held on June 7 and 8, 1999. On the second day of trial, Hardaway moved for a mistrial, claiming that the Judge interrupted his testimony before the jury, and audibly accused him of lying during a bench conference with counsel. His motion was denied. Hardaway also objected unsuccessfully to the jury being instructed that it could convict him of burglary if it found that he entered the Dobitz home "to commit either the offense of theft or the offense of sexual assault therein." The jury found Hardaway guilty of burglary, and he was sentenced to thirty years at the Montana State Prison. Hardaway now appeals to this Court.

## ISSUE 1

¶10 **Did the District Court properly deny Hardaway's motion to suppress blood evidence swabbed from his hands without a warrant following his arrest?**

¶11 This Court reviews a district court's ruling on a suppression motion to determine whether the court's findings are clearly erroneous, and whether the findings were correctly applied as a matter of law. *State v. Weaselboy*, 1999 MT 274, ¶ 6, 296 Mont. 503, ¶ 6, 989 P.2d 836, ¶ 6. When, as here, the facts are essentially undisputed, this Court's review of a district court's conclusions of law is plenary. *State v. Devlin*, 1999 MT 90, ¶ 7, 294 Mont. 215, ¶ 7, 980 P.2d 1037, ¶ 7.

¶12 Hardaway argues that the swabbing of blood from his hands without permission was clearly a search, which must be justified by both probable cause and exigent circumstances. He asserts that no exigent circumstances existed because he was in custody at the time and a warrant could have been obtained. Thus, he maintains that denial of the motion to suppress the blood evidence was error.

¶13 The State counters that the non-intrusive swabbing of blood from the surface of Hardaway's hands following his arrest and during processing at the detention facility was not a search within the protective scope of the Fourth Amendment or the privacy and search provisions of the Montana Constitution. The State alternatively argues that if this swabbing did constitute a warrantless search, the procedure was fully justified as a search incident to a lawful arrest and is therefore exempt from the warrant requirement.

### A. Constitutional Protections Against
### Unreasonable Searches and Seizures

¶14 It is important to note, before determining whether the swabbing of Hardaway's hands constituted a search and, if so, whether the search was lawful in the absence of a warrant, that both the federal

and the Montana constitutions offer protection against unreasonable searches and seizures. Article II, Section 11 of the Montana Constitution mirrors the familiar language of the Fourth Amendment to the United States Constitution:

> **Searches and seizures.** The people shall be secure in their persons, papers, homes and effects from unreasonable searches and seizures. No warrant to search any place, or seize any person or thing shall issue without describing the place to be searched or the person or thing to be seized, or without probable cause, supported by oath or affirmation reduced to writing.

These rights extend to all of Montana's citizens including those suspected of a criminal act or charged with one.

### B. Was the Swabbing of Hardaway's Hands a Search?

¶15 The first question this Court must answer is whether the swabbing of Hardaway's hands actually constituted a search. We start with the obvious proposition that the swabbing of his hands was undertaken to procure evidence to be used against him. This distinguishes the swabbing from an inventory search which is best described as a "routine administrative caretaking function," as opposed to an evidentiary or investigatory activity. *South Dakota v. Opperman* (1976), 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000.

¶16 ■ A search is the use of some means of gathering evidence which infringes upon a person's reasonable expectation of privacy. *State v. Elison*, 2000 MT 323, ¶ 48, 302 Mont. 228, ¶ 48, 14 P.3d 456, ¶ 48. To determine what constitutes a search pursuant to Article II, Section 11 of the Montana Constitution, we consider two separate factors: (1) whether the person had an actual expectation of privacy that society is willing to recognize as reasonable; and (2) the nature of the state's intrusion. *State v. Scheetz* (1997), 286 Mont. 41, 48, 950 P.2d 722, 726 (use of drug-detecting canine to sniff luggage which was entrusted to an airline was not a search in violation of defendant's right to privacy). Applying the first of the two factors established by *Scheetz*, it is necessary to determine what, if any, reasonable expectation of privacy did Hardaway have.

¶17 Article II, Section 11 of the Montana Constitution, recited in its entirety above, guarantees that people shall be "secure in their persons ... from unreasonable searches and seizures." The question of whether an action constitutes a search is rarely addressed in a vacuum; generally, we are called upon to analyze a challenged search in the context of its exigency, the presence or lack of probable cause, or the sufficiency of a search warrant. See, e.g., *State v. Bassett*, 1999 MT 109, 294 Mont. 327, 982 P.2d 410 (warrantless entry into burned house

by police was an unlawful search, a violation of owner's right to privacy, and was not justified by the exigent circumstances or plain view exceptions to the warrant requirement); *State v. Bullock* (1995), 272 Mont. 361, 901 P.2d 61 (warrantless entry by police onto fenced, posted private property constituted an unlawful search and evidence of a crime derived from such entry was inadmissible); *Elison*, ¶ 54 (warrantless search of an automobile requires the existence of probable cause as well as a generally applicable exception to the warrant requirement such as a plain view search, a search incident to arrest, or exigent circumstances); *State v. Reesman*, 2000 MT 243, 301 Mont. 408, 10 P.3d 83 (application for a search warrant did not provide a substantial basis for the conclusion that probable cause existed for the search of the home). However, we deem it important here to isolate the inquiry of whether the swabbing of Hardaway's hands constituted a search, requiring constitutional scrutiny.

¶18 The United States Supreme Court has addressed a search situation similar to that presented here. In *Cupp v. Murphy* (1973), 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900, the U.S. Supreme Court ruled that the taking of a suspect's fingernail clippings to determine if they contained the blood of his murdered wife was a search under the Fourth Amendment of the Constitution. In *Cupp*, the defendant, Murphy, voluntarily went to the police station to be questioned about the strangulation death of his wife. While being questioned, the police noticed a dark spot beneath his fingernails. When asked if they could look more closely, Murphy refused and put his hands in his pocket and appeared to be rubbing them. Without his consent or a warrant, the police took scrapings and obtained what was later identified as his wife's blood, skin tissue and nightgown fibers. The U.S. Supreme Court stated that "the search of [Murphy's] fingernails went beyond mere 'physical characteristics ... constantly exposed to the public,' and constituted the type of 'severe though brief, intrusion upon cherished personal security' that is subject to constitutional scrutiny." *Cupp*, 412 U.S. at 295, 93 S.Ct. 2000.

¶19 The Supreme Court of Indiana likewise faced a similar situation. In *McClain v. Indiana* (Ind. 1980), 410 N.E.2d 1297, McClain was arrested and charged with rape. The police obtained a warrant, the sufficiency of which was challenged by McClain, to allow the performance of a swab emission test designed to determine the presence in McClain of a sexually transmitted disease detected in the young victim. After reviewing the *Cupp* holding, the Indiana Supreme Court reasoned that if a fingernail scraping unconstitutionally intrudes upon a person's privacy interest, it would be difficult to say

that an equal privacy interest did not exist in body fluids which could detect sexually transmitted disease. "Given the fundamental human interests at stake, the conclusion we reach is that the intrusion involved in the swab emission examination is sufficient in magnitude to require constitutional justification." *McClain*, 410 N.E.2d at 1301.

¶20 The *Cupp* decision continues to be relied upon by many federal circuits and state jurisdictions for its search and seizure analyses. *State v. Murry* (Kan. 2001), 21 P.3d 528 (arrest is not a prerequisite to a warrantless search if probable cause and exigent circumstances exist–blood sample taken at hospital from suspected intoxicated driver was justified); *U.S. v. Morgan* (3rd Cir. 2000), 2000 U.S. Dist. LEXIS 15905 (warrantless search of premises by police justified by probable cause that illegal activity was occurring and exigent circumstances indicating the destruction of evidence); *In Re Grand Jury Proceedings Involving Vickers* (D.N.H. 1998), 38 F. Supp. 2d 159 (obtaining fingerprint evidence does not implicate Fourth Amendment concerns as fingerprints are mere physical characteristics which are constantly exposed to the public); *U.S. v. Chapel* (9th Cir. 1995), 55 F.3d 1416, (warrantless seizure of blood evidence for intoxication testing following a motorcycle accident was justified based upon exigent circumstances despite not being accompanied by an arrest). Despite *Cupp's* longevity and the numerous courts that have relied upon it, however, this Court has previously relied on *Cupp* only as authority for issues *other* than its analysis of what constitutes a search.

¶21 In *Ulrich,* supra, this Court cited *Cupp* for the proposition that destructible or evanescent evidence may be seized without a warrant. In *State v. Campbell* (1980), 189 Mont. 107, 615 P.2d 190, *Cupp* was analyzed in determining whether a blood sample could be obtained from an unconscious person involved in a suspected drunk driving accident when, because the person was unconscious, the police were unable to arrest him or her. Neither of these cases looked to *Cupp* to help define whether the warrantless taking of evidence from one's person constitutes a search under the Fourth Amendment.

¶22 The District Court found that the swabbing of blood from Hardaway's hands for purposes of conducting a DNA test did not constitute a search based on this Court's holding in *Holzapfel*. The *Holzapfel* case involved, *inter alia*, shining an ultraviolet light on an arrestee's hands for the purpose of determining the presence or absence of invisible detection powder. At the time *Holzapfel* was decided, several courts had been wrestling with whether such use of an ultraviolet light constituted a "search in the Fourth Amendment sense." *Holzapfel*, 230 Mont. at 111, 748 P.2d at 956. Recognizing that

"the numerical majority" of other courts concluded that such use was not a search, and relying on *U.S. v. Dionisio* (1973), 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67, the *Holzapfel* Court found that Holzapfel did not have a reasonable expectation of privacy as to the presence of foreign matter on his hands and that the ultraviolet test used was similar to the taking of fingerprints. *Holzapfel*, 230 Mont. at 111-12, 748 P.2d at 957. The Court further noted that fingerprints are constantly and knowingly exposed to the public as are other physical characteristics, such as our voices. The majority explained that the Fourth Amendment provides no protection for what "a person knowingly exposes to the public." *Holzapfel*, 230 Mont. at 111-12, 748 P.2d at 957.

¶23 ▮ Today, we adopt *Cupp's* analysis of what constitutes a search. Based upon the evolution and current trend of search and seizure and privacy cases in Montana, discussed in greater detail below, and contrary to our previous holding in *Holzapfel*, we conclude that Hardaway, like Murphy in *Cupp*, had a reasonable expectation of privacy as to his person and personal security. We further conclude that the warrantless swabbing of his hands for the purpose of obtaining evidence constituted a search subject to the protections of the federal and the Montana constitutions. While his hands and the blood upon them were exposed to the public for viewing, it was not the viewing that constituted the search; it was the swabbing. To the extent that *Holzapfel* is inconsistent with this opinion, it is expressly overruled. This brings us to the second question in our search analysis.

### C. Was this Search Valid as a Search Incident to Lawful Arrest?

### 1. Federal Law

¶24 While inventory searches do not require a warrant, to conduct an investigatory search, police must obtain a warrant or successfully demonstrate that an exception to the Fourth Amendment warrant requirement exists. Numerous exceptions to search warrant requirements have developed including, but not limited to, "hot pursuit," "plain view/feel," "stop and frisk," "exigent circumstances" and "search incident to arrest" under § 46-5-102, MCA. It is this latter exception upon which the State relies.

¶25 The right of a police officer to conduct a search incident to a lawful arrest has a long and confusing history in our federal case law. *Chimel v. California* (1969), 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (chronicling the inconsistent history of the search incident to a lawful arrest exception to the warrant requirement). *Chimel* involved a warrantless search of the defendant's house. Three police officers

arrived one night at Chimel's home with an arrest warrant for him, but no search warrant for the house. Chimel's wife allowed the officers to wait inside the house for Chimel to return home from work. When Chimel arrived, the officers placed him under arrest and then asked for his permission to look around his home. *Chimel*, 395 U.S. at 753, 89 S.Ct. 2034. Chimel refused their request, but they searched the entire house anyway. *Chimel*, 395 U.S. at 754, 89 S.Ct. 2034. The United States Supreme Court held that the search of Chimel's house was not constitutionally justified as incident to a lawful arrest. *Chimel*, 395 U.S. at 768, 89 S.Ct. 2034. Rather, the Court held that the search, to be properly incident to a lawful arrest, should have been limited to the "grab" area surrounding the arrestee. *Chimel*, 395 U.S. at 768, 89 S.Ct. 2034.

¶26 The United States Supreme Court then muddied the "search incident to arrest" waters by applying its reasoning in *Chimel* to the *Cupp* case (supra) which did *not* involve a lawful arrest. In *Cupp,* discussed above, the police took fingernail scrapings while Murphy was voluntarily present at the police station to answer questions about his wife's death. He was not formally arrested until approximately one month later. *Cupp*, 412 U.S. at 294, 93 S.Ct. 2000. Nevertheless, the United States Supreme Court held that:

> The rationale of Chimel, in these circumstances, justified the police in subjecting him to the very limited search necessary to preserve the highly evanescent evidence they found under his fingernails.

*Cupp*, 412 U.S. at 296, 93 S.Ct. 2000.

¶27 The confusion over what constitutes a search incident to a lawful arrest increased when in the next session, the United States Supreme Court decided the case of *United States v. Robinson* (1973), 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427. Robinson was arrested for a traffic violation. The arresting officer conducted a search of Robinson's person at the scene and discovered a crumpled cigarette package in Robinson's pocket. Inside the cigarette package, the officer discovered 14 gelatin capsules of white powder which he suspected was, and later analysis proved to be, heroin. *Robinson*, 414 U.S. at 223, 94 S.Ct. 494. The United States Supreme Court held that this was a valid search incident to arrest which required no further justification than a valid arrest. *Robinson*, 414 U.S. at 235, 94 S.Ct. 467.

¶28 In its analysis, the *Robinson* Court explained that the search incident to an arrest exception to the warrant requirement has historically been divided into two distinct propositions:

> The first is that a search may be made of the *person* of the

arrestee by virtue of the lawful arrest. The second is that a search may be made of the area within the control of the arrestee.

*Robinson*, 414 U.S. at 224, [94 S.Ct. 467] (emphasis in original). The Court explained that these two propositions had historically been treated quite differently by the case law. *Robinson*, 414 U.S. at 224, [94 S.Ct. 467]. Most of the federal case law, including *Chimel*, has focused on to what extent an officer could search the area around an arrestee. The Court in *Robinson* explained that while the Court had frequently addressed the permissible area beyond the person of an arrestee which could be searched incident to a lawful arrest, no doubt had been expressed as to the unqualified authority of an arresting officer to search the *person* of the arrestee. *Robinson*, 414 U.S. at 225, [94 S.Ct. 467]. The Court then went on to firmly hold that this exception requires no further justification than a lawful arrest:

> The authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect. A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment. That intrusion being lawful, a search incident to the arrest requires no additional justification. It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a "reasonable" search under that Amendment.

*Robinson*, 414 U.S. at 235, 94 S.Ct. 467.

¶29 Robinson has been consistently followed in subsequent United States Supreme Court decisions. *See, e.g., Knowles v. Iowa* (1998), 525 U.S. 113, 119 S.Ct. 484, 142 L.Ed.2d 492 (where the Court distinguished a vehicle search incident to the issuance of a traffic citation from a search of the person incident to a lawful arrest); *Michigan v. DeFillippo* (1979), 443 U.S. 31, 99 S.Ct. 2627, 61 L.Ed.2d 343 (holding that a search was incident to a lawful arrest even though the ordinance upon which the arrest was premised was later held to be unconstitutional); *United States v. Edwards* (1974), 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (holding that a search that took place 10 hours after arrest was still a search incident to arrest); *Gustafson v. Florida* (1973), 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456 (limitations occasioned by the Court's holding in *Terry v. Ohio* (1968), 392 U.S 1,

88 S.Ct. 1868, 20 L.Ed.2d 889, are not to be carried over to searches made incident to lawful custodial arrests).

¶30 There is little doubt that the search at issue here would constitute a permissible search incident to a lawful arrest under federal law, as the *Robinson* bright-line rule, requiring no further justification than a lawful arrest for the search incident to a lawful arrest exception to apply, still controls federal Fourth Amendment law.

### 2. Montana Law

¶31 We must now decide, however, whether this search was valid as a search incident to a lawful arrest under Montana law. To do this, we will look to the Montana Constitution, to applicable Montana statutes and to relevant Montana case law, and, as in the past, will not feel compelled to "march lock-step" with federal courts. States are free to grant citizens greater protections based on state constitutional provisions than the United States Supreme Court divines from the United States Constitution. *State v. Sawyer* (1977), 174 Mont. 512, 515, 571 P.2d 1131, 1133 (overruled on other grounds by *State v. Long* (1985), 216 Mont. 65, 700 P.2d 153). As long as we guarantee the minimum rights established by the United States Constitution, we are not compelled to march lock-step with pronouncements of the United States Supreme Court if our own constitutional provisions call for more individual rights protection than that guaranteed by the United States Constitution. *State v. Sierra* (1985), 214 Mont. 472, 476, 692 P.2d 1273, 1276 (overruled in part on other grounds by *State v. Pastos* (1994), 269 Mont. 43, 887 P.2d 199). In addition, we have held that Montana's unique constitutional language affords citizens a greater right to privacy, and therefore, broader protection than the Fourth Amendment in cases involving searches of, or seizures from, private property. *Sawyer*, 174 Mont. at 516, 571 P.2d at 1133.

¶32 When analyzing search and seizure questions that specifically implicate the right of privacy, this Court must consider Sections 10 and 11 of Article II of the Montana Constitution. *State v. Hubbel* (1997), 286 Mont. 200, 207, 951 P.2d 971, 975. Because Montana's constitutional protections exist and apply separately from those of the federal constitution, it is necessary to perform an independent analysis of the privacy and search and seizure provisions of the Montana Constitution. *Elison*, ¶ 45 (*citing Bullock*, 272 Mont. at 383, 901 P.2d at 75).

¶33 Article II, Section 11, recited above, protects citizens from unreasonable searches and seizures and requires that search warrants be issued only after probable cause for such a warrant has been established, and that the warrant provides specific information.

¶34 Article II, Section 10, however, does not have a federal constitutional counterpart and grants Montana citizens a specific right to privacy. This unique constitutional language assures citizens a greater right to privacy and broader protections than does the federal constitution. Article II, Section 10 of Montana's Constitution provides:

> **Right of privacy**. The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest.

This Court has held that "[T]he right to privacy is the cornerstone of protections against unreasonable searches and seizures." *State v. Solis* (1984), 214 Mont. 310, 319, 693 P.2d 518, 522.

¶35  In light of the constitutional right to privacy to which Montanans are entitled, we have held that the range of warrantless searches which may be lawfully conducted under the Montana Constitution is narrower than the corresponding range of searches that may be lawfully conducted pursuant to the federal Fourth Amendment. *Elison*, ¶ 46.

¶36  ■ Warrantless searches are *per se* unreasonable under Montana law. *State v. Graham* (1995), 271 Mont. 510, 512, 898 P.2d 1206, 1208. A warrantless seizure of evidence, however, may be permissible if it falls under one of the few carefully drawn exceptions to the warrant requirement recognized under Montana's unique constitutional language. *State v. Dolan* (1997), 283 Mont. 245, 252, 940 P.2d 436, 440. One of the exceptions recognized in Montana is a search incident to a lawful arrest. *Elison*, ¶ 54.

¶37 Here, it is uncontroverted that Hardaway was lawfully arrested. The question, however, is whether the search incident to a lawful arrest exception to the warrant requirement in Montana requires more than just a showing of a lawful arrest.

¶38 Hardaway argues that for any warrantless search to be justified, including a warrantless search incident to a lawful arrest, there must be a showing of exigent circumstances which did not exist in his situation. The State argues that the search, if it was a search at all, was justified as a search incident to a lawful arrest to preserve "destructible blood evidence" and as such was authorized by § 46-5-102(4), MCA. It further argues that such a position is supported by both federal and Montana case law. The State maintains that in *Ulrich*, 187 Mont. at 351, 609 P.2d at 1220 (Sheehy, J., dissenting), this Court adopted the federal bright-line rule laid out in *Robinson*, and urges us to conclude that because, under both *Ulrich* and *Robinson*, Hardaway's hands were swabbed as part of a search incident to a lawful arrest, we should end our analysis there. Having

already determined that a search occurred, we now analyze the State's legislative and judicial arguments.

¶39 The Montana Legislature has enacted a statute which specifically lists the underlying purposes for allowing a warrantless search incident to a lawful arrest:

> **§ 46-5-102, MCA Scope of search incident to arrest.** When a lawful arrest is effected, a peace officer may reasonably search the person arrested and the area within such person's immediate presence for the purposes of:
>
> (1) *protecting the officer from attack;*
>
> (2) preventing the person from escaping;
>
> (3) discovering and seizing the fruits of the crime; or
>
> (4) discovering and seizing any persons, instruments, articles, or things which may have been used in the commission of or which may constitute evidence of the offense.

¶40 As the cases discussed below demonstrate, in allowing warrantless searches under § 46-5-102, MCA, we have, for several years, consistently held that the scope of a warrantless search incident to arrest **must** be commensurate with its underlying purpose of preventing an arrestee from using any weapons he or she may have, escaping, or destroying any incriminating evidence in his or her possession. We have applied this statute so as to allow searches where exigent circumstances call for them, while precluding unjustified or expansive searches once an arrest has been made. "[E]xigent circumstances are those circumstances that would cause a reasonable person to believe that prompt action was necessary to prevent physical harm to police officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." *Elison*, ¶ 56 (*citing State v. Wakeford*, 1998 MT 16, ¶ 24, 287 Mont. 220, ¶ 24, 953 P.2d 1065, ¶ 24.) Subsections (1) through (3) of § 46-5-102, MCA, are obvious examples of exigent circumstances where immediate action is required, precluding the time-consuming process of obtaining a warrant. Subsection (4), however, could be read so as to justify a warrantless search even when exigent circumstances do not exist.

¶41 See, for example, *State v. Graham*, supra. Graham was a passenger in a car stopped by a police officer. Upon discovering that the driver had a suspended license, the driver was arrested. The officer learned shortly thereafter that Graham had warrants against her and, upon arrival of a second officer, Graham was arrested as well. She requested that her purse remain with the car, which was to be retrieved by a neighbor, as it contained items "her children would

need." The officer, however, took the purse to the police station and a warrantless search revealed narcotics. Graham was charged with criminal possession of dangerous drugs. *Graham*, 271 Mont. at 511-12, 898 P.2d at 1207. The district court denied Graham's motion to suppress the evidence seized from her purse, concluding that the warrantless search "of an item of personal property immediately associated with [Graham]" fell within the search incident to a lawful arrest exception. This Court disagreed, holding that the warrantless search of Graham's purse in the police station after the arrest could not serve any of the four purposes set out in § 46-5-102, MCA–it could not protect the arresting officer; it could not prevent the defendant from escaping; it could not result in discovering fruits of the crimes underlying the city warrants, and it could not have resulted in the discovery of anything which may have been used in the commission of the offenses which resulted in the city warrants. Therefore, we concluded the search was unlawful and any evidence gathered as a result of it should have been suppressed. *Graham*, 271 Mont. at 512-13, 898 P.2d at 1208.

¶42 Compare further, *State v. Hammer* (1988), 233 Mont. 101, 759 P.2d 979, in which the victim called police to report that, while visiting Hammer's trailer, Hammer had stabbed him with a large kitchen knife and shot at him with a rifle. *Hammer*, 233 Mont. at 104, 759 P.2d at 981. When police officers arrived at Hammer's mobile home, neither Hammer nor his wife responded to their repeated, hour-long requests to enter, and fearing a hostage situation, they forcibly entered the trailer. While no hostage situation existed, when they attempted to arrest Hammer, he resisted. Hammer's wife also interfered with his arrest. During the commotion associated with the arrest, officers noticed and seized a bloody kitchen knife and a rifle, both within close proximity of Hammer. The officers also gathered evidence at the scene in addition to the knife and rifle, including bullet fragments, evidence of a bullet hole in the door, blood spots and unspent cartridges, all supporting the victim's description of his altercation with Hammer. Hammer was charged with two counts of felony assault, and at trial sought to suppress use of the evidence claiming there was an unlawful warrantless search. *Hammer*, 233 Mont. at 105, 759 P.2d at 982. The District Court held that it was a justifiable warrantless search incident to a lawful arrest. This Court affirmed, determining that the warrantless search of Hammer's trailer served two purposes set forth in the applicable statute: under § 46-5-102(1), MCA, it protected the arresting officers from possible injury or death by allowing for the seizure of an easily accessible knife and rifle used to assault another

person that night; and under § 46-5-102(4), MCA, it preserved evidence of the earlier assaults against destruction. We noted that Mrs. Hammer was not arrested and could have destroyed any evidence not seized or preserved by the police. *Hammer*, 233 Mont. at 109-10, 759 P.2d at 984-85.

¶43 In *Hammer*, the warrantless search was justified under § 46-5-101(1), MCA, to protect the arresting officers. Moreover, as we noted, the potential destruction of valuable evidence by the uncooperative Mrs. Hammer upon departure by the police, provided the necessary exigent circumstances to justify the search under § 46-5-102(4), MCA. Thus, in *Hammer* we found exigency, while in *Graham* we did not. In both cases, its presence and absence, respectively, dictated the outcome of our opinion.

¶44 Since *Hammer* and *Graham*, this Court has repeatedly required the existence of some exigent circumstances before sanctioning a warrantless search.

¶45 In *Elison*, police officers searched Elison's truck after stopping him on suspicion of driving under the influence of drugs. The search, which yielded drugs, occurred without Elison's permission, prior to his arrest, without a warrant, and after Elison had been removed from the vehicle, therefore posing no threat to the officers. *Elison*, ¶¶ 9-10. The District Court upheld the warrantless search finding several acceptable exigent circumstances to justify a search without a warrant, *i.e.*, the officer's belief that the vehicle contained drugs, the fact that it was 12:05 a.m. and too late to obtain a warrant, and the risk that an Elison confederate could move the vehicle. *Elison*, ¶ 36. This Court, analyzing the case under both Sections 10 and 11 of Article II of the Montana Constitution, reversed the District Court, holding that the "exigent" circumstances relied upon by the officer and the district court were insufficient to justify a search without first obtaining a warrant. "The State bears the heavy burden of showing the existence of exigent circumstances and can meet that burden only by demonstrating specific and articulable facts." *Elison*, ¶ 56. "We conclude that the State did not bear its ... burden of demonstrating [such] facts indicating the necessity of searching Elison's vehicle without first obtaining a warrant." *Elison*, ¶ 58. (Compare *California v. Carney* (1985), 471 U.S. 386, 105 S.Ct. 2066, 85 L.Ed.2d 406, in which the U.S. Supreme Court stated that one exception to a warrant requirement is the "automobile exception," which the Court created based on the mobility of the vehicle and the belief that there was a reduced expectation of privacy in an automobile. As a comparison between *Elison* and *Carney* reveals, the Montana right to privacy, when applied

to search and seizure cases, may well result in this Court's departure from U.S. Supreme Court rulings.)

¶46 Other Montana cases requiring a showing of exigent circumstances to justify a warrantless search include *Dolan*, 283 Mont. 245, 940 P.2d 436 (drawing of blood from defendant without warrant was unlawful search and seizure); *Wakeford*, ¶ 25 (warrantless entry into defendant's motel room was justified under the exigent circumstances exception to the warrant requirement); *State v. Keating*, 1998 MT 109, ¶ 21, 288 Mont. 447, ¶ 21, 958 P.2d 690, ¶ 21 (warrantless entry into pawn shop was justified under the exigent circumstances exception to the warrant requirement); *Bassett*, ¶ 44, (defendant retained reasonable expectation of privacy in his bedroom closet after firefighters entered his home and observed marijuana plants in plain view, requiring the police to obtain a warrant, absent exigent circumstances).

¶47 Having established that this Court has almost always required exigent circumstances to exist before a warrantless search will be upheld, we now address the case which is the noted exception to that rule: *Ulrich*.

¶48 In *Ulrich*, this Court adopted and applied the *Robinson* test. In *Ulrich*, following his arrest, the police ran cotton swabs over the fingers, palms, and top of Ulrich's hands, in order to perform a neutron activation test. The officers were attempting to determine whether there was gunpowder residue on his hands. The swabs were then placed in a special kit and mailed to a scientific laboratory for examination. *Ulrich*, 187 Mont. at 349, 609 P.2d at 1219. We concluded that the administration of the test was within the permissible scope of a search incident to a lawful arrest under the Fourth Amendment. *Ulrich*, 187 Mont. at 352, 609 P.2d at 1221.

¶49 The facts presented in *Ulrich* are distinguishable from those presented here. *Ulrich* involved seizing and preserving foreign particles that were evanescent in nature, and therefore capable of destruction unless immediately taken, while a sample of Hardaway's blood at issue here was capable of preservation until a warrant could be obtained. Such a distinction, however, would be contrived, because the Court in *Ulrich* made it clear that no finding of imminent destruction was required. *Ulrich*, 187 Mont. at 354, 609 P.2d at 1222. Accordingly, we will not walk the fine line of attempting to distinguish *Ulrich* and *Hardaway* on their facts. Instead, we analyze *Ulrich* against the backdrop of the Montana cases establishing our right to privacy, and our search and seizure jurisprudence.

¶50 As was noted with federal law, Montana also has a confusing

history of case law relative to searches incident to lawful arrest. Prior to 1972, Article II, Section 10 did not exist and there was no explicit right of privacy in the Montana Constitution. The search and seizure provision in Article II, Section 11, however, has existed in its current form, except for minor punctuation changes, since the adoption of Montana's original 1889 Constitution, at which time it was taken directly from the Fourth Amendment to the U.S. Constitution. For several years after the adoption of the 1972 Montana Constitution, cases raising search and seizure issues under Article II, Section 11 generally followed the lead of the U.S. Supreme Court. *See*, Larry M. Elison and Fritz Snyder, <u>The Montana State Constitution, A Reference Guide</u>, page 53 (2001). Similarly, as the 1972 right to privacy developed, our privacy decisions also tended to follow U.S. Supreme Court decisions. *Id.* at 50.

¶51 As our body of privacy case law grew, however, inconsistencies in analysis began to appear. For example, in *State v. Sawyer* (1977), supra, this Court first applied Article II, Section 10 to a search and seizure case and explicitly stated that Section 10 provided greater individual privacy protection in such cases than did the federal constitution. We restated this rule in *State v. Solis* (1984), supra, and *State v. Sierra* (1985), supra, among others. During this same time, however, the Court ruled on numerous other search and seizure cases and made no reference to Article II, Section 10 whatsoever. *See State v. Jetty* (1978), 176 Mont. 519, 579 P.2d 1228; *State v. Cripps* (1978), 177 Mont. 410, 582 P.2d 312; *State v. Ulrich* (1980), supra, and *State v. Kelly* (1983), 205 Mont. 417, 668 P.2d 1032. Subsequently, from the mid-1980s through the early 1990s, the Court provided no greater protection for individual privacy in search and seizure cases than parallel federal law provided. Elison & Snyder, *supra*, at 52. However, since *City of Billings v. Whalen* (1990), 242 Mont. 293, 790 P.2d 471, this Court has given increased protection to the privacy rights of Montana citizens, limiting the scope of search and seizure cases, and since *State v. Bullock* (1995), supra, the Court has applied Article II, Section 10, emphasizing "privacy as a mechanism to support interpretation of search and seizure cases." Elison & Snyder, *supra*, at 54 and 52. In the ensuing years, we consistently analyzed search and seizure cases involving significant privacy issues under both Sections 10 and 11 of Article II of the Montana Constitution. See *State v. Siegal* (1997), 281 Mont. 250, 934 P.2d 176 (overruled in part on other grounds by *State v. Kuneff*, 1998 MT 287, ¶ 19, 291 Mont. 474, ¶ 19, 970 P.2d 556, ¶ 19); *Hulse v. State, Dept. of Justice,* 1998 MT 108, 289 Mont. 1, 961 P.2d 75*; State v. Elison,* supra.

¶52 Notably, our decision in *Ulrich* in 1980 significantly predated the post-1990 cases in which we have more readily and consistently applied the constitutional right to privacy to search and seizures cases. In addition, another case decided in the 1980's also requires examination and distinction: *City of Helena v. Lamping* (1986), 221 Mont. 370, 719 P.2d 1245.

¶53 *Helena v. Lamping*, supra, cited *Robinson* as authority. In *Lamping*, during post-arrest processing at the county jail, an inventory search was performed which yielded the discovery of drugs in the shirt pocket of the arrestee. As a result, the arrestee was charged with drug possession in addition to his original charges. *Lamping*, 221 Mont. at 371, 719 P.2d at 1246. The warrantless search of Lamping's pocket was justified as an inventory search of Lamping and "all objects immediately associated with him" [as distinguished from objects within his immediate control but not on his person]. As discussed above, an administrative inventory search differs from an *Ulrich* evidentiary search in that its purpose is not to discover and preserve evidence, but rather, is to protect police and other prisoners from potential danger and to protect police and the arrestee by creating an accounting of personal items. *Lamping*, 221 Mont. at 372-73, 719 P.2d at 1247.

¶54 Thus, while *Lamping* cites *Robinson*, it does not stand for the proposition underlying *Robinson,* which is that a search of a person who is under arrest may always be justified, even in the absence of exigent circumstances.

¶55 The *Ulrich* Court relied exclusively on the U.S. Constitution and federal case law to reach its decision; it did not address or take into account Montana's constitutional right of privacy. As mentioned above, the type of warrantless search at issue here passes federal Fourth Amendment muster. However, we must conclude it does not survive Montana constitutional scrutiny.

¶56 When we analyze *Ulrich* against our more recent case law, it is apparent that the *Ulrich* decision is an anomaly. *See, e.g., Elison,* ¶ 54 (holding that there is no automobile exception to the warrant requirement under the Montana Constitution); *Siegal*, 281 Mont. at 257, 934 P.2d at 180 (use of thermal imaging in context of criminal investigation constitutes a search under Montana's Constitution); *Bullock*, 272 Mont. at 384, 901 P.2d at 76 (rejecting the doctrine that an individual does not have a legitimate expectation of privacy in an open field).

¶57 ▇ Based upon our prevailing jurisprudence and consistent trend toward protecting the privacy interests of our citizens, we therefore

hold that the scope of a warrantless search incident to a lawful arrest under § 46-5-102, MCA, must be commensurate with the underlying purposes of preventing an arrestee from using any weapons he or she may have, escaping, or destroying any incriminating evidence in his or her possession. Additionally, we find that while Subsections (1) through (3) of § 46-5-102, MCA, inherently anticipate exigent circumstances, such as police protection, escape, or imminent destruction of evidence, to the extent a warrantless search incident to a lawful arrest is performed under § 46-5-102(4), MCA, specific and articulable exigent circumstances are also required to justify and render lawful such a search. To the extent *Ulrich* is inconsistent with this opinion, it is expressly overruled.

¶58 Turning to the facts in the case before us, we have already concluded that the swabbing of Hardaway's bloody hands constituted a search. We now conclude that the search was not conducted in accordance with the rationale permitting a warrantless search incident to a lawful arrest in Montana. It was not done to prevent Hardaway from using a weapon or from escaping. Its purpose was not to discover or seize "the fruits of the crime," nor was it conducted to preserve evanescent evidence. From the record, it is clear the police knew that the blood they swabbed and sent in for analysis was Hardaway's blood, and not the blood of a victim that could be washed away unless taken at once. Had the goal been simply to preserve evidence that there was blood on Hardaway's hands, that was accomplished by the photographs taken of his hands while in custody. In the alternative, the officers could have bagged Hardaway's hands and kept him under surveillance until obtaining a valid search warrant.

¶59 ■■■ Under these facts, there were simply no exigent circumstances requiring a warrantless search, and the search conducted was not necessary to guarantee any of the safeguards underlying § 46-5-102, MCA. We therefore decide this case on adequate and independent state grounds and hold that the search of Hardaway's hands was not a valid search incident to a lawful arrest under Montana law and under Montana's Constitution. *Michigan v. Long* (1983), 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201.

¶60 In a somewhat circular argument, the dissent maintains that exigent circumstances existed which justified the warrantless seizure of the blood on Hardaway's hands. The justification offered for this conclusion is that prompt action was needed to prevent the destruction of the evanescent blood evidence. However, in reaching this conclusion, the dissent ignores the underlying circumstances critical to this entire analysis: Hardaway was in custody in the station house. He was under

the full control of the police. He had no present means of destroying the blood evidence, nor was it going to evaporate on its own. Hardaway could either consent to the swab, or wait in discomfort until a warrant was obtained. Either way, the evidence was going nowhere. These circumstances completely nullify the claimed exigency upon which the dissent relies for its entire analysis.

¶61 We have stated: "The presence of a search warrant serves a high function. [Requiring a search warrant is] not done to shield criminals. ... It is done so that an objective mind might weigh the need to invade [our right to] privacy in order to enforce the law." *State v. McLees*, 2000 MT 6, ¶ 26, 298 Mont. 15, ¶ 26, 994 P.2d 683, ¶ 26.

¶62 For the foregoing reasons the District Court is reversed on this issue.

## ISSUE 2

**¶63 Did the District Court err in denying Hardaway's motion to dismiss the amended information, and in allowing the jury to convict Hardaway if it found that he intended to commit either a theft or a sexual crime?**

¶64 The grant or denial of a motion to dismiss in a criminal case is a question of law which is reviewed *de novo* on appeal. *State v. Diesen*, 2000 MT 1, ¶ 11, 297 Mont. 459, ¶ 11, 992 P.2d 1287, ¶ 11. Our standard of review is plenary, and this Court determines whether a district court's conclusion is correct. *Diesen*, ¶ 11.

¶65 Hardaway first argues that the term "sexual crime," which was one of the internal offenses of burglary charged in the amended information, is not sufficiently definite in its legal meaning. He further argues that the jury instructions were improperly given in the alternative, allowing the jury to convict even though some members believed he intended theft, while others believed he intended a sexual crime. Therefore, Hardaway claims it was error for the District Court to deny his motion to dismiss the amended information, to deny his motion for a directed verdict, and to instruct the jury as it did.

¶66 The State responds that the amended information gave Hardaway sufficient notice of the charge against him. The State asserts that Hardaway had full notice of the facts supporting the burglary charge, and the amended information properly alleged, in the alternative, that Hardaway had the purpose or intention of committing either a theft or a sexual crime when he broke into the victim's home. The State also claims the evidence fully supported the prosecutor's theory on Hardaway's intent, and that the jury was properly instructed on the matter.

¶67 ■ An information is sufficient if it properly charges an offense in the language of the statute defining the offense charged. *State v. Steffes* (1994), 269 Mont. 214, 223, 887 P.2d 1196, 1201-02 (use of the terms "deviate sexual relations" and "sexual contact" in the information provided sufficient notice because both terms were defined in the Code). The standard applied to determine if an information is sufficient, is whether a person of common understanding would know what was charged. *Steffes*, 269 Mont. at 223, 887 P.2d at 1202. The underlying purpose of an information is to reasonably apprise the accused of the charges against him so that he may prepare his defense. *Steffes*, 269 Mont. at 223, 887 P.2d at 1202.

¶68 Hardaway was charged with burglary. "A person commits the offense of burglary if he knowingly enters or remains unlawfully in an occupied structure with the purpose to commit an offense therein." Section 45-6-204, MCA. The amended information alleged:

> That the defendant, JASON HARDAWAY, (d.o.b. 08-17-71), 3115 Poly Drive, Billings, Montana, knowingly entered or remained unlawfully in an occupied structure with the purpose to commit an offense therein, to wit: without authority, defendant broke into Chris Dobitz's residence and defendant intended to commit either a theft or a sexual crime against the victim; at or near _____, Billings, Yellowstone County, Montana; all of which is a violation of Section 45-6-204, Montana Code Annotated statute, and against the peace and dignity of the State of Montana.

¶69 We conclude that this amended information failed to adequately put Hardaway on notice of the nature or character of the offense he was accused of intending to commit. Although numerous discrete offenses which are sexual in nature are defined in the Montana Code Annotated, the purported offense of "sexual crime" is not. The information fails to provide any factual allegations that would indicate which of the potential offenses of a sexual nature Hardaway is being accused of intending to commit. A person of common knowledge has no way of determining which of these potential offenses, if any, is being charged.

¶70 We also agree with Hardaway that the amended information and the challenged jury instruction would allow some members of the jury to convict him of attempting a theft, while others might convict him of attempting a sexual crime. The Montana Constitution provides: "In all criminal actions, the verdict shall be unanimous." Art. II, Sec. 26, Mont.Const. This is not to say that all informations pled in the alternative are unconstitutional. *McKenzie v. Osborne* (1981), 195

Mont. 26, 44, 640 P.2d 368, 379 (overruled in part on other grounds by *State v. Van Kirk*, 2001 MT 184, 306 Mont. 215, 32 P.3d. 735) (rejecting a challenge to alternative charges). However, if an accused is charged in the alternative, the jury must be clearly instructed that it is required to reach a unanimous verdict as to each individual alternative. *State v. Weldy* (1995), 273 Mont. 68, 79, 902 P.2d 1, 7 (right to a unanimous verdict was violated because it was not clear that the jury was required to reach a unanimous verdict under each subsection pled in the alternative). Unanimity requires more than a conclusory agreement that the accused is guilty of *some* charged offense; the jury must be in agreement as to the principal factual elements underlying a specified offense. *State v. Weaver*, 1998 MT 167, ¶ 33, 290 Mont. 58, ¶ 33, 964 P.2d 713, ¶ 33 (failure of the district court to instruct the jury that it had to reach a unanimous verdict as to at least one specific underlying act of sexual assault for each count was error).

¶71 ■ Hardaway's jury was not properly instructed that it had to reach a unanimous decision on whether Hardaway intended to commit theft, or whether he intended to commit a crime of a specified sexual nature. Absent such an instruction, Hardaway was denied his right to a unanimous verdict. Therefore, in addition to finding error in the manner in which Hardaway was charged, we also hold that the District Court erred by not properly instructing the jury as to the requirement of unanimity in its verdict.

¶72 For the foregoing reasons, the judgment of conviction is reversed, and this matter is remanded for further proceedings consistent with this Opinion. Since we reverse under Issues One and Two, we need not address the final issue raised.

JUSTICES NELSON, REGNIER and LEAPHART concur.

JUSTICE TRIEWEILER specially concurs.

¶73 I concur with the result of the majority opinion. However, I do not agree with all that is stated in that opinion.

¶74 I concur with the majority's conclusion that the swabbing of blood found on Hardaway's hands constituted a search subject to constitutional protections and that the warrantless search under the circumstances in this case was prohibited by the Montana Constitution. However, I disagree with the majority's conclusion that the same search was not prohibited by the Federal Constitution as interpreted by the United States Supreme Court. I believe that closer analysis of federal case law on this subject is necessary.

¶75 Any analysis of whether the swabbing of Hardaway's blood was a valid search incident to lawful arrest properly begins with *Chimel v.*

*California* (1969), 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685. However, *Chimel*, which has never been reversed by the Supreme Court, merits greater consideration than given by the majority. In *Chimel*, the issue was whether a search of the defendant's home without a search warrant was justified on the ground that it had been incident to a valid arrest of the defendant. The Supreme Court did an exhaustive review of prior decisions interpreting and limiting the scope of searches pursuant to valid arrests. Although it concluded that those decisions had not always been consistent, the Court observed that the right to be free from unreasonable searches and seizures was a principle catalyst for the American Revolution and that the requirement of a search warrant absent some imperative exigency is not a mere formality. The Court cited its decision in *McDonald v. United States* (1948), 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153, where it stated that "[t]he right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals." *Chimel*, 395 U.S. at 761. The Court made clear that a common thread running through its prior decisions was "the general requirement that a search warrant be obtained is not lightly to be dispensed with, and 'the burden is on those seeking (an) exemption (from the requirement) to show the need for it. ...' *United States v. Jeffers* (1951), 342 U.S. 48, 51, 72 S.Ct. 93, 95, 96 L.Ed. 59." *Chimel*, 395 U.S. at 762, 89 S.Ct. 2034.

¶76 It was based on the rationale that warrantless searches are limited by their demonstrated need that the parameters of searches incident to a lawful arrest were established. In that regard the Court stated:

> A similar analysis underlies the 'search incident to arrest' principle, and marks its proper extent. When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of the arrestee's person and the area

'within his immediate control' -- construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.

*Chimel*, 395 U.S. at 762-63, 89 S.Ct. 2034.

¶77 It was on that basis that the Court found there was no justification for searching any room of the defendant's home other than the room in which the arrest occurred. To reinforce the rationale for its decision, the Court explained that:

No consideration relevant to the Fourth Amendment suggests any point of rational limitation, once the search is allowed to go beyond the area from which the person arrested might obtain *weapons or evidentiary items*.

*Chimel*, 395 U.S. at 766, 89 S.Ct. 2034. (Underlining added.)

...

Application of sound Fourth Amendment principles to the facts of this case produces a clear result. *The search here went far beyond the petitioner's person and the area from within which he might have obtained either a weapon or something that could have been used as evidence against him.* There was no constitutional justification, in the absence of a search warrant, for extending the search beyond that area. *The scope of the search was, therefore, 'unreasonable'* under the Fourth and Fourteenth Amendments and the petitioner's conviction cannot stand.

*Chimel*, 395 U.S. at 768, 89 S.Ct. 2034. (Underlining added.)

¶78 In other words, the U.S. Supreme Court in *Chimel* sets forth very clear limitations on the permissible scope of a warrantless search incident to a valid arrest. It held that the scope of the search is limited by the need for a warrantless search and that the need is limited to detection of a weapon or evidence which is capable of concealment or destruction. The swabbing of blood found on Hardaway's hand to determine whether it matched blood left by the perpetrator at the scene of the crime being investigated came within neither category listed by the Court as exceptions to the warrant requirement when incident to a lawful arrest.

¶79 *Cupp v. Murphy* (1973), 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900, as noted by the majority, did not involve a search incident to a lawful arrest. However, what the Supreme Court did do in *Cupp* is reiterate the valid scope of searches incident to a valid arrest as established in *Chimel*. The Court in *Cupp* stated as follows:

*Chimel* stands in a long line of cases recognizing an exception to the warrant requirement when a search is incident to a valid arrest. *Id.*, at 755-762, 89 S.Ct. at 2035-2039. The basis for this

exception is that when an arrest is made, it is reasonable for a police officer to expect the arrestee to use any weapons he may have and to attempt to destroy any incriminating evidence then in his possession. *Id.*, at 762-763, 89 S.Ct. at 2039-2040. *The court recognized in Chimel that the scope of a warrantless search must be commensurate with the rationale that excepts the search from the warrant requirement.*

412 U.S. at 295, 93 S.Ct. 2000. (Underlining added.)

¶80 *United States v. Robinson* (1973), 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427, on which the majority relies, was decided by the Supreme Court a little more than six months after its decision in *Cupp,* which reaffirmed the principle established in *Chimel.* Notably, *Robinson* did not reverse *Chimel,* it did not distinguish *Chimel,* and it did not explicitly modify *Chimel.* In *Robinson,* the issue was whether a search pursuant to a valid arrest for driving while a license is revoked is limited to a search for weapons since no further evidence of the crime would be obtained. The Court of Appeals suppressed evidence obtained during the frisk of the defendant pursuant to *Terry v. Ohio* (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889. The Supreme Court distinguished *Terry* on the basis that it did not involve an arrest for probable cause and after again tracing the evolution of permissible searches pursuant to a valid arrest, restated the principle bases for permitting those searches. In *Robinson,* the court stated:

The justification or reason for the authority to search incident to a lawful arrest rests quite as much on the need to disarm the suspect in order to take him into custody as it does on the need to preserve evidence on his person for later use at trial. (Citations omitted.) The standards traditionally governing a search incident to lawful arrest are not, therefore, commuted to the stricter *Terry* standards by the absence of probable fruits or further evidence of the particular crime for which the arrest is made.

414 U.S. at 234, 94 S.Ct. 467.

¶81 In other words, the point of the Court's decision in *Robinson* was that a search incident to a lawful arrest may include a search to preserve evidence which would otherwise be destroyed even though the evidence does not relate to the crime for which the person was arrested. It was in the process of arriving at that conclusion that the Supreme Court made the statement relied on by the majority that the mere fact of a lawful arrest establishes the only basis necessary for a search. In this case, the arresting authorities were looking for evidence of Hardaway's blood type to match with blood found at the scene of the crime. Hardaway's blood, other than that which was found on his

hands, was not capable of destruction and, therefore, I would conclude that the holding in *Robinson* is inapplicable to the facts in this case.

¶82 I would agree that the language employed by the Supreme Court in *Robinson* gives rise to some confusion about the continuing applicability of the parameters established in *Chimel*. However, I conclude that the confusion is dispelled by the Supreme Court's subsequent decision in *Knowles v. Iowa* (1998), 525 U.S. 113, 119 S.Ct. 484, 142 L.Ed.2d 492. In *Knowles,* the defendant was also stopped for a traffic violation but was issued a citation rather than being arrested. The investigating officer then conducted a full search of his car and found marijuana and a pot pipe. The defendant moved to suppress the evidence but the state supreme court concluded that so long as the investigating officer had the authority to make an arrest, there need not in fact have been an arrest to justify a search pursuant to *Robinson*. The Supreme Court reversed, not because this defendant was issued a citation as opposed to being arrested, but because neither of the two historical exceptions which justified searches incident to a lawful arrest were found to exist in that case. When identifying those two historical justifications, the Court referred to officer safety and the need to discover and preserve evidence.

¶83 In an opinion authored by the same jurist who had authored the *Robinson* opinion (Chief Justice Rehnquist), the Court stated:

> In *Robinson, supra,* we noted the two historical rationales for the "search incident to arrest" exception: (1) the need to disarm the suspect in order to take him into custody, and (2) the need to preserve evidence for later use at trial. (Citations omitted.) But neither of these underlying rationales for the search incident to arrest exception is sufficient to justify the search in the present case.

*Knowles*, 525 U.S. at 116, 119 S.Ct. 484.

¶84 The Court in *Knowles* explained its decision as follows:

> In *Robinson,* we held that the authority to conduct a full field search as incident to an arrest was a "bright line rule," which was based on the concern for officer safety and destruction or loss of evidence, but which did not depend in every case upon the existence of either concern. Here we are asked to extend that "bright line rule" to a situation where the concern for officer safety is not present to the same extent and the concern for destruction or loss of evidence is not present at all. We decline to do so.

525 U.S. at 118-19, 119 S.Ct. 484.

¶85 In other words, the U.S. Supreme Court has made clear that the scope of searches pursuant to valid arrest is limited by the need for the

search. The two reasons that a search is necessary are protection of the investigating officer from weapons and preservation of evidence which could otherwise be destroyed. In this case, neither concern was present. Hardaway was already in custody and had presumably been searched for weapons and evidence of Hardaway's blood type could not be destroyed. Blood could have been drawn from him at a later date pursuant to a search warrant. Therefore, it is clear from Supreme Court case law that the search in this case was not authorized pursuant to a valid arrest and I disagree with the majority's conclusion to the contrary.

¶86 Other than as stated in this opinion, I agree and concur with the conclusions set forth in the majority opinion.

CHIEF JUSTICE GRAY, specially concurring.

¶87 I join in the entirety of the Court's opinion on issue two. I also join in the Court's result, and most of its analysis, on issue one. I write separately to offer an additional perspective on why the search of Hardaway, via the swabbing of blood from his hands at the detention facility, is not a lawful search incident to arrest. This perspective is a simple and readily understandable one.

¶88 Section 46-5-102, MCA, permits a reasonable search by a peace officer of an arrested person and the area within such person's immediate presence, for certain purposes, "[w]hen a lawful arrest is effected[.]" The first definition of the word "when" in MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 1345 (10th ed. 1993), is "at or during the time that." Using that everyday definition of the statutory term "when" and applying § 46-5-102, MCA, to the facts of this case, I conclude the search via swabbing of Hardaway's hands renders the search invalid as one incident to arrest.

¶89 The pertinent facts are as follows. The victim called law enforcement shortly after 4:30 a.m., on January 22, 1999, and Officer Helderop responded to the area very shortly thereafter. He saw a person not too far from the scene of the alleged offense who appeared to meet the description he had been provided and stopped that person, who turned out to be Hardaway. He questioned Hardaway and patted him down for weapons. He requested Officer Philippi, who was at the crime scene, to bring the victim to his location for a possible identification of Hardaway. After the victim failed to identify Hardaway as her intruder, but said she recognized him as having done some work at her residence the day before, Officer Helderop arrested Hardaway and transported him to the Yellowstone County Detention Facility. There, some of Hardaway's clothing was seized and his hands were photographed. While Officer Helderop did not testify directly that

the swabbing of the blood occurred during that time, he did state that he stayed at the facility for approximately one-half hour. It seems likely that the swabbing occurred during that approximate period of time.

¶90 On these facts, I would conclude that the search was not incident to arrest under § 46-5-102, MCA, because it did not occur "at or during the time that" the arrest was effected. Rather, the search occurred later, after Hardaway was transported to the detention facility and apparently after Hardaway's clothing was seized and his hands photographed. Indeed, the State acknowledges in the Statement of the Facts portion of its brief that the "blood on [Hardaway's] hands was swabbed during the *post-arrest process*." (Emphasis added.) I would agree, and hold that the plain meaning of the statute, applied to the facts of this case, does not support the State's position that this was a search incident to arrest.

¶91 In so holding, I would not be implying that a valid search incident to arrest must occur at the precise moment the arrest is effected, and not a moment later. Such an approach would render a legal search incident to arrest impossible, a result far from that clearly intended by the Legislature in enacting § 46-5-102, MCA. Nor does the common sense definition referenced above suggest such a result. The statute is clear, however, that a valid search incident to arrest is to be conducted at or near the time of the arrest, and not after transport of the arrestee and during–as the State puts it–"the post-arrest process" at the detention facility.

¶92 For these reasons, and in an effort to set forth in plain, everyday language what I believe the statute and the Court's more sophisticated analysis require, I specially concur in the Court's opinion on issue one.

JUSTICE RICE dissenting.

¶93 I respectfully dissent.

¶94 The Court holds that police could not, incident to Hardaway's arrest, obtain the blood on his hands without first obtaining a search warrant. The Court's holding requires that police, following a suspect's arrest, "bag" his bloody hands, keep him under surveillance while waiting for a warrant, and seize the blood evidence only after the warrant is issued. I believe that the Court's holding is erroneous.

¶95 The Court's introductory analysis is well founded. I concur with the adoption of the search analysis in *Cupp v. Murphy*, and the conclusion, pursuant to *Cupp*, that the swabbing of Hardaway's hands constituted a warrantless search. *Holzapel* is thus inconsistent to the extent that it found an ultraviolet lighting of the defendant's hands was not a search. I further concur that the Montana Constitution

provides greater protections to our citizens than afforded under the United States Constitution on this issue, making the existence of exigent circumstances an appropriate consideration when reviewing warrantless searches, and when applying the provisions of § 46-5-102, MCA. However, I believe that *Holzapel* and *Ulrich*, though now flawed in their search analyses, reached the correct results.

¶96 It is the Court's application of the exigent circumstances requirement in this case which is erroneous. The Court holds that "there was simply no exigent circumstances requiring a warrantless search," finding the warrantless search was unnecessary because:

> Its purpose was not to discover or seize "the fruits of the crime," nor was it conducted to preserve evanescent evidence. From the record, it is clear the police knew that the blood they swabbed and sent in for analysis was Hardaway's blood, and not the blood of a victim that could be washed away unless taken at once. Had the goal been simply to preserve evidence that there was blood on Hardaway's hands, that was accomplished by the photographs taken of his hands while in custody. In the alternative, the officers could have bagged Hardaway's hands and kept him under surveillance until obtaining a valid search warrant. [¶ 58]

¶97 The Court's reasoning is flawed in several respects. First, the Court finds that the search was not conducted to preserve evanescent evidence. It reasons that because the police knew the substance on Hardaway's hands was his own blood, there was not an urgency that would exist if the substance had been the victim's blood "that could be washed away unless taken at once."

¶98 The missed point here is that the blood on Hardaway's hands—regardless of *whose* it was—was subject to loss precisely because it "could be washed away unless taken at once." The evidence here was no less evanescent just because it may have been Hardaway's blood, because it was, nonetheless, valuable evidence that was subject to immediate loss.[1] Further, while the police may have made certain

---

[1] The Court has understated the significance and value of the blood evidence on Hardaway's hands.

Justice Trieweiler's concurrence states that Hardaway's blood was not capable of destruction "other than that which was found on his hands." He later reasons that this risk of destruction did not establish grounds for a warrantless search because "evidence of Hardaway's blood type could not be destroyed." While it is true that Hardaway's blood type could be confirmed by later testing, both the concurrence and the majority opinion overlook the larger value of the evidence. The issue here is larger than identification of blood type.

Blood on Hardaway's hands at the time of his arrest is an evidentiary link between him and the time and place of the crime, since he was arrested within a few blocks and within a few minutes of the crime. A later blood test provides no such time

assumptions about the nature of the blood, there could not be certainty about those assumptions until a sample had been tested and confirmed. For that reason, it was necessary for police to prevent the "washing away" of the evidence by acting promptly to seize and preserve it.

¶99 Secondly, the Court reasons that if the police's goal was simply to preserve evidence that there was blood on Hardaway's hands, that goal was accomplished by the photographs taken of Hardaway's hands. Leaving aside the point that a photograph alone may be insufficient to establish the existence of blood, the Court's holding produces a conflicted result: that it is permissible to subject an arrested suspect to the process of photographing his hands without a warrant, but it is not permissible to conduct a simple surface swabbing of his hands without a warrant. I submit that the same exigent circumstances on which the Court permits the photographing process also exist for the swabbing process. Both are unobtrusive procedures which capture evidence from the suspect's hands which may be lost. The Court inexplicably requires a warrant for the swabbing process only. In *United States v. Bridges* (7th Cir. 1974), 499 F.2d 179, *cert. denied* 419 U.S. 1010, 95 S.Ct. 330, 42 L.Ed.2d 284, the defendant moved to suppress, on Fourth Amendment grounds, the nonconsensual swabbing of his hands which had occurred at the station house following his arrest to confirm the suspected presence of explosives. The Seventh Circuit Court recognized the exigent circumstances inherent to preserve such evidence and upheld the warrantless search, comparing it to photographing the defendant:

> It is apparent that had the agents not swabbed Bridges' hands at the time, the opportunity may not have knocked again, especially if Bridges washed his hands. ... *The swabbing was no more offensive to Bridges' person than fingerprinting or photographing him.*

*Bridges*, 499 F.2d at 184 (emphasis added). *See also, Ray v. State* (Ark. 1991), 803 S.W.2d 894, which, relying on *Bridges*, found exigent circumstances existed to sanction a warrantless gunpowder residue

---

and place nexus. The hand blood is also an evidentiary link between Hardaway's hands and everything he had touched that night, particularly the broken glass which produced the blood and which was Hardaway's means of entry. Lastly, and most importantly, evidence that the blood found at the scene matched the blood on Hardaway's hands allows proof of the facts of the crime to be made by direct evidence: that Hardaway had cut his hands on entry, became bloodied, touched items in the premises with his bloody hands, and that the cuts he sustained produced a sufficient amount of blood to leave it around the property and on himself. Without the blood from Hardaway's hands, the prosecution would be required to establish some of these facts circumstantially.

test conducted at the police station because "had appellant washed his hands, the chance to conduct the test would have been gone."

¶100    I would find that exigent circumstances existed to justify the warrantless seizure of the blood on Hardaway's hands. This Court has clearly defined exigent circumstances as follows:

> [E]xigent circumstances are those circumstances that would cause a reasonable person to believe that prompt action was necessary to prevent physical harm to police officers or other persons, [or] *the destruction of relevant evidence* . . . .

*State v. Elison,* 2000 MT 323, ¶ 56, 302 Mont. 228, ¶ 56, 14 P.3d 456, ¶ 56 (citing *State v. Wakeford,* 1998 MT 15, 287 Mont. 220, 953 P.2d 1065) (emphasis added).

¶101    I respectfully submit that a reasonable person would believe that prompt action was necessary to prevent the destruction of relevant blood evidence on Hardaway's hands. In fact, the Court impliedly admits this necessity. If destruction of evidence was not a concern, there would be no need for the Court to suggest that the police "bag" the defendant's hands. There would be no further need for the Court to instruct police to "keep [the defendant] under surveillance until obtaining a valid search warrant," unless it was to prevent the defendant from destroying the evidence against him which lies in his very hands.

¶102    The Court is essentially holding that the existence of evanescent crime evidence on a suspect's hands does not establish exigent circumstances justifying a warrantless seizure if the police conceivably had other means of securing the evidence until a warrant could be obtained. This holding inserts a speculative analytical methodology into search incident to arrest that is found nowhere in American jurisprudence. I respectfully submit that, sadly, this "bag and watch" decision comports neither with any legal precedent nor with the realities of law enforcement. I strongly dissent.

¶103    I further dissent from the Court's holding on Issue 2, although the Court's reversal of the conviction on the suppression issue negates need for a lengthy discussion. First, the Amended Information charged Hardaway with the offense of burglary in the precise language of the statute, properly apprising him of the charge, and notifying him of the prosecution's theft or sexual crime theory. *State v. Steffes* (1994), 269 Mont. 214, 887 P.2d 1196.

¶104    However, the Court faults the Information because it "would allow some members of the jury to convict him of attempting a theft, while others might convict him of attempting a sexual crime." Hardaway was charged neither with attempted theft nor attempt of a

sexual crime, and further, the State was not required to prove these offenses. The State was required to prove only that Hardaway unlawfully entered Ms. Dobitz' home "with the purpose to commit an offense therein." Section 45-6-204(1), MCA (1997). The State is not burdened with also establishing the elements of an underlying or attempted offense that the charged burglar intended to commit. Here, the State offered evidence from which the jury could infer that Hardaway's purpose was to commit either theft or a sexual crime, which the District Court instructed was the crime of sexual assault, and of which the Amended Information gave sufficient notice.

¶105 The District Court then properly instructed the jury that, after consideration, it must return a unanimous verdict. After consideration, it did so. I would affirm.